451 S.E.2d 779

**Larry E. PAXTON, Plaintiff Below, Appellee,**

**v.**

**STATE of West Virginia DEPARTMENT OF TAX AND REVENUE, Defendant Below, Appellant.**

**No. 22218.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 28, 1994.

Decided Nov. 23, 1994.

Vincent J. King, Charleston, for appellee.

Barry L. Koerber, Asst. Atty. Gen., Charleston, for appellant.

MILLER, Justice: [1]

The appellee, Larry E. Paxton, filed a petition for a writ of mandamus seeking to

---

1. Pursuant to an Administrative Order entered by this Court on September 13, 1994, retired Justice Thomas B. Miller was recalled for the September

compel the Lottery Commission operated by the West Virginia Department of Tax and Revenue to require that all vendors who sell lottery tickets be accessible to the disabled as a condition precedent to the issuance or renewal of their licenses. By order entered September 30, 1993, the Circuit Court of Kanawha County, West Virginia, granted the relief requested by the appellee. We granted this appeal in order to determine the correctness of the lower court's decision that the Lottery Commission is required to make its lottery locations accessible to the disabled by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

Congressional concern for the disabled is clear and forceful, as is demonstrated by the first four legislative findings set out in 42 U.S.C. § 12101(a):

The Congress finds that—

(1) some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;

(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services; ·

(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination; ...

The ADA, which was passed on July 26, 1990, and became effective on January 26, 1992,[2] addresses several broad categories of prohibited areas of discrimination. Subchapter I deals with employment discrimination. *See* 42 U.S.C. §§ 12111–12117. Subchapter II, Part A, covers discrimination in public services and entities which are at issue in this case. *See* 42 U.S.C. §§ 12131–12134. Part B of Subchapter II covers discrimination in public transportation by public entities. *See* 42 U.S.C. §§ 12141–12165. Finally, Subchapter III deals with discrimination in public accommodations and services operated by private entities. *See* 42 U.S.C. §§ 12181–12189.

Congress did not outline in detail the specific obligations of public entities under the Americans with Disabilities Act.[3] Instead, Congress made a general pronouncement against discrimination in 42 U.S.C. § 12132[4] and delegated to the United States Attorney General the duty to promulgate regulations under 42 U.S.C. § 12134(a)[5]. These regulations are contained in 28 C.F.R. § 35.101 *et seq.* For the most part, the parties' arguments in this case involve the interpretation of these regulations.

### I.

The underlying facts of this case are not in dispute. Both parties concede that Mr. Pax-

1994 term because of the physical incapacity of Chief Justice W.T. Brotherton, Jr.

2. *See* 42 U.S.C. § 12131 notes.

3. 42 U.S.C. § 12131(1) defines "public entity" as follows:
(1) Public entity
The term 'public entity' means—
(A) any State or local government;
(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and
(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 502(8) of Title 45).    ·

4. 42 U.S.C. § 12132 states:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

5. 42 U.S.C. § 12134(a) states:

Not later than 1 year after July 26, 1990, the Attorney General shall promulgate regulations in an accessible format that implement this part. Such regulations shall not include any matter within the scope of the authority of the Secretary of Transportation under section 12143, 12149, or 12164 of this title.

ton is a paraplegic who meets the statutory definition of "disability" found in 42 U.S.C. § 12131(2)[6]. Likewise, the Lottery Commission is a "public entity" as that term is defined in 42 U.S.C. § 12131(1). At issue in this case are the legal consequences that flow from these facts.[7]

Mr. Paxton maintains that the regulations which set forth the obligation of a public entity under Title II of the ADA control the Lottery Commission's obligation to ensure that all lottery vendors be accessible to him and other people with disabilities as a condition precedent to the issuance or renewal of their lottery licenses. Under 28 C.F.R. § 35.130(b)(1)(i) and (ii), a public entity that provides any aid, benefit, or service is precluded from allowing discrimination against a qualified person with a disability, whether through contractual, licensing, or other arrangements.[8]

**6.** 42 U.S.C. § 12131(2) states:

(2) Qualified individual with a disability
The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

**7.** Moreover, it is clear that state courts have jurisdiction over ADA violations under 42 U.S.C. § 12201(b):

Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter. Nothing in this chapter shall be construed to preclude the prohibition of, or the imposition of restrictions on, smoking in places of employment covered by subchapter I of this chapter, in transportation covered by subchapter II or III of this chapter, or in places of public accommodation covered by subchapter III of this chapter.

**8.** 28 C.F.R. § 35.130(b)(1) states, in part:

A public entity, in providing any aid, benefit, or service, may not directly or through contractual, licensing or other arrangements, on the basis of disability—

Mr. Paxton also argues that when the Lottery Commission selects the facilities where lottery tickets are to be offered to the public, the Lottery Commission is required to select locations that do not discriminate against those with disabilities. 28 C.F.R. § 35.130(b)(4) prohibits a public entity which determines the site or location of a facility[9] from making selections that discriminate against individuals with disabilities.[10]

On the other hand, the Lottery Commission argues that 28 C.F.R. § 35.130(b)(4) cannot be read to impose a higher level of accessibility on a public entity than the entity would be required to meet if it owned, or directly supplied, the service to the public. In this regard, the Lottery Commission points to 28 C.F.R. § 35.150(a)(1), which addresses existing facilities and does not require each facility to be usable by the disabled so long as it is accessible when viewed in its entirety.[11] The Lottery Commission

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; ...

**9.** The term "facility" is defined in 28 C.F.R. § 35.104 as:

*Facility* means all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located.

**10.** 28 C.F.R. § 35.130(b)(4) states:

A public entity may not, in determining the site or location of a facility, make selections—
(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or
(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

**11.** 28 C.F.R. § 35.150(a)(1) provides:

(a) General. A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This paragraph does not—

argues that sufficient evidence was introduced below to show that a majority of the lottery facilities were accessible to individuals with disabilities.

## II.

■ Before directly answering the legal issues posed by the parties, it is useful to outline some of the salient provisions of our State Lottery Act, W.Va.Code, 29–22–1 *et seq.*[12] The initial mandate for the Lottery Commission is found in W.Va.Code, 29–22–9(a) (1990).[13] Under W.Va.Code, 29–22–10(a) (1990), the Lottery Commission is empowered to establish "rules and regulations for the licensing of lottery sales agents for the sale and dispensing of lottery tickets, materials and lottery games, and the operations of electronic computer terminals...." West Virginia Code, 29–22–10(a) also contains a number of specific conditions:

(1) The commission shall issue its annual license to such lottery sales agents for each outlet ... on forms to be ... furnished by the director.

(2) No licensee may engage in business exclusively as a lottery sales agent.

(3) The commission shall ensure geographic distributions of lottery sales agents throughout the state.

(4) Before issuance of a license to an applicant, the commission shall consider factors such as the financial responsibility, security, background, accessibility of the place of business or activity to the public, public convenience and the volume of expected sales.

It is obvious that when it created the lottery system, the legislature wanted the lottery to be controlled by the Commission through a license system which was supervised by the Commission. Under W.Va. Code, 29–22–10(a)(10), a wide variety of organizations are eligible to act as licensees.[14] Moreover, under W.Va.Code, 29–22–10(a)(11), a licensee receives a commission of 5% of gross sales with the possibility of a further bonus.[15] Even before the ADA became law, the Legislature recognized the importance of public accessibility to lottery facilities. West Virginia Code, 29–22–10(a)(4), requires the Commission to evaluate the issuance of a license by considering, among other factors, the "accessibility of the place of business or activity to the public, public convenience...." Finally, under W.Va. Code, 29–22–23, it is the Commission, not the licensee, that contracts for the purchase of

---

(1) Necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities; ...

**12.** In *State ex rel. Mountaineer Park, Inc. v. Polan,* 190 W.Va. 276, 438 S.E.2d 308 (1993), we discussed the State Lottery Act in relation to whether it authorized what was referred to as "video lottery." We concluded it did not. This result was subsequently changed by the enactment of the Racetrack Video Lottery Act, W.Va.Code, 29–22A–1 (1994).

**13.** West Virginia Code, 29–22–9(a), states:

The commission shall initiate operation of the state lottery on a continuous basis at the earliest feasible and practical time, first initiating operation of the preprinted instant winner type lottery. The lottery shall be initiated and shall continue to be operated so as to produce the maximum amount of net revenues to benefit the public purpose described in this article consonant with the public good. Other state government departments, boards, commissions, agencies and their officers shall cooperate with the lottery commission so as to aid the lottery commission in fulfilling these objectives.

**14.** West Virginia Code, 29–22–10(a)(10), states:

The commission may issue licenses to any legitimate business, organization, person or entity, including, but not limited to, civic or fraternal organizations; parks and recreation commissions or similar authorities, senior citizen centers, state owned stores, persons lawfully engaged in nongovernmental business on state property, persons lawfully engaged in the sale of alcoholic beverages; political subdivisions or their agencies or departments, state agencies, commission operated agencies; persons licensed under the provisions of article twenty-three [§ 19–23–1 *et seq.*], chapter nineteen of this code, and religious, charitable or seasonal business.

**15.** West Virginia, 29–22–10(a)(11), provides:

Licensed lottery sales agents shall receive five percent of gross sales as commission for the performance of their duties. In addition, the commission may promulgate a bonus-incentive plan as additional compensation not to exceed one percent of annual gross sales. The method and time of payment shall be determined by the commission.

the lottery materials.[16]

### III.

■ We are not cited nor have we found a case that deals with the ADA in a lottery context. In *Tyler v. City of Manhattan,* 849 F.Supp. 1429 (D.Kan.1994), the federal district court addressed the question of whether the city's issuance of liquor licenses and building permits to various businesses brought it within the ambit of 28 C.F.R. § 35.130(b)(1). As we quoted earlier, this provision states that a public entity which provides "any aid, benefit, or service, may not directly or through contractual, licensing or other arrangements" deny a disabled person the opportunity to participate or benefit. In *Tyler,* the court rejected application of this regulation because the city did not provide the services operated by the businesses. The court stated:

Although City programs operated under contractual or licensing arrangements may not discriminate against qualified individuals with disabilities, *see* 28 C.F.R. 35.130(b)(1), "[t]he programs or activities of licensees or certified entities are not themselves programs or activities of the public entity merely by virtue of the license or certificate."

*Id.* at 1441.

In a footnote which followed this text, the court in *Tyler* gave this example:

For example, a concessionaire operating in a city park under a contractual arrangement with the city might be considered a city service. However, a licensed food service establishment operating on private property would not be considered a city service, activity, or program just because

the city granted it a license to conduct its food service business.

*Id.* at 1441, n. 24.

Somewhat helpful is the district court's analysis in *Independent Housing Services of San Francisco v. Fillmore Center Associates,* 840 F.Supp. 1328 (N.D.Cal., 1993), which involved the San Francisco Redevelopment Agency (Agency), which was a public entity. The Agency had contracted with the Fillmore Center to provide bond financing. In turn, the Center provided services to persons living in adjacent apartment complexes. The lawsuit involved a question of whether the Agency's relationship to the Center brought the Agency within the purview of the ADA. In concluding that the Agency came under the ADA, the court made this analysis:

Fillmore Center, however, is part of a program or activity of the Agency—the program or activity of urban renewal. Since public entities may not discriminate in their programs and activities and Fillmore Center is part of a program or activity of the Agency, the ADA applies to the Agency's involvement with Fillmore Center.

Plaintiffs argue that the provision of disability-neutral assistance (such as bond financing) violates the ADA if the assistance is provided to an organization that discriminates against disabled beneficiaries of the public agency's program. The court agrees. The provision of bonds is a "service" within the meaning of section 12132, and a disabled person *is* denied the benefit of that service (the funding and provision of low income housing) if she or he is prevented from living in the low income housing because of his or her disability.

*Id.* at 1344.

These cases offer us some guidance, as does our state lottery scheme itself. It is

---

**16.** West Virginia Code, 29–22–23 (1985), provides, in relevant part:

(a) The commission shall utilize the provisions of article three [§ 5A–3–1 et seq.], chapter five-a of this code in the procurement of all commodities, printing, services and goods, materials, lottery tickets and other items necessary for the commission and lottery, subject to the provisions of subsection (b) of this section.

(b) For the printing of tickets used in any lottery game, any goods or services involving the receiving or recording of number selection

of any lottery game, or any goods or services involving the determination of winners on any lottery game, which are hereby referred to as major procurements, the commission shall evaluate the competence, integrity, character, reputation and background of the vendor. To allow for this evaluation, potential vendors shall supply the following information prior to the submission of an initial bid or proposal and on or before the first day of July of each year thereafter;

clear that the Lottery Commission offers more than a mere license to the entities which are given lottery outlets. This is not like the liquor and building permits issued by the city in *Tyler*, where the city had no control over the premises or services. Here, through its contract vendors the Lottery Commission furnishes the lottery devices and services that allow the licensee to conduct lottery sales. The Lottery Commission is clearly a public entity within the meaning of the Americans with Disabilities Act, and it provides an aid, benefit or service on a continuing basis to its licensee. Therefore, the Lottery Commission comes within the scope of 28 C.F.R. § 35.130(b)(1), which precludes a public entity that provides any aid, benefit, or service from allowing disability discrimination, either through contractual, licensing, or other arrangements.[17]

In reaching this conclusion, we reject the appellant's argument that the lottery is only engaged in a licensing arrangement under 28 C.F.R. § 35.130(b)(6).[18] As we noted earlier, the Lottery Commission does more than merely license lottery locations. It controls and obtains substantial monies from the lottery system.

■ Having resolved the issue of coverage under 28 C.F.R. § 35.130(b)(1), we decline to address the question of whether the Lottery Commission has violated 28 C.F.R. § 35.130(b)(4),[19] which relates to a public entity's responsibility under the ADA when it determines the site or location of a facility. Nor will we determine whether the "existing facilities" language contained in 28 C.F.R. § 35.150(a) is applicable.[20] It is not argued that the lottery ticket and its attendant equipment are inherently inaccessible to individuals with disabilities.

■ However, the lottery is the service provided by the Lottery Commission, and it is this service that makes the Lottery Commission subject to the ADA under 28 C.F.R. § 35.130(b)(1). When the Lottery Commission allows this service to be provided on premises which are inaccessible to individuals with disabilities, it violates its obligations under law. The owners or lessees of these premises have a separate responsibility under the public accommodation provisions of the ADA, which are contained in Subchapter III. The list of private entities which are subject to public accommodations regulations are contained in 42 U.S.C. § 12181(7) and are broadly defined. They include motels, restaurants, bars, filling stations, grocery stores, shopping centers, and other sales or rental establishments. The general rule prohibiting discrimination is set out in 42 U.S.C. § 12182(a).[21] However, because individual licensees are not parties to this litigation, we do not direct any relief against them.

In conjunction with an amicus curiae brief of the West Virginia Petroleum Workers and Convenience Store Association and Gtech Corporation, copies of administrative regulations from the states of Florida and Texas were filed with this Court. Both of these states have lotteries, and the administrative regulations were issued basically to require the lottery retailer to comply with the ADA. If the retailer failed to comply, its lottery sales license would then be suspended. Other state lottery commissions also may have

---

**17.** For the text of 28 C.F.R. § 35.130(b)(1), *see* note 8, *supra*.

**18.** 28 C.F.R. § 35.130(b)(6) provides:

A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.

**19.** For the text of 28 C.F.R. § 35.130(b)(4), *see* note 10, *supra*.

**20.** For the text of 28 C.F.R. § 35.150(a)(1), *see* note 11, *supra*.

**21.** 42 U.S.C. § 12182(a) states:

(a) General rule
No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

issued administrative regulations concerning compliance with the ADA which may offer additional guidance to West Virginia's Lottery Commission.

We conclude that the Lottery Commission has a legal duty under the ADA to require its lottery retail licensees to comply with the ADA by issuing appropriate administrative rules and regulations. The writ of mandamus has been used to compel public officials to promulgate administrative rules and regulations to carry out what has been found to be a mandatory duty. In syllabus point 6 of *Lyons v. Richardson*, 189 W.Va. 157, 429 S.E.2d 44 (1993), we explained:

> " ' "Mandamus is a proper remedy to compel tribunals and officers exercising discretionary and judicial powers to act, when they refuse so to do, in violation of their duty, but it is never employed to prescribe in what manner they shall act, or to correct errors they have made." Syl. pt. 1, *State ex rel. Buxton v. O'Brien*, 97

W.Va. 343, 125 S.E. 154 (1924).' Syl. pt. 2, *State ex rel. Lambert v. Cortellessi*, 182 W.Va. 142, 386 S.E.2d 640 (1989)." Syllabus, *Ney v. West Virginia Workers' Compensation Fund*, 186 W.Va. 180, 411 S.E.2d 699 (1991).[22]

For the foregoing reasons, we affirm the judgment of the Circuit Court of Kanawha County and direct the Lottery Commission to promulgate administrative regulations.

Affirmed with Directions.

BROTHERTON, C.J., did not participate.

MILLER, Retired J., sitting by special assignment.

---

**22.** *See also State ex rel. Billy Ray C. v. Skaff*, 190 W.Va. 504, 438 S.E.2d 847 (1993) (mandamus to promulgate administrative rules regarding investigations of claims asserting use of excessive physical force by State Police); *Smith v. West Virginia State Board of Education*, 170 W.Va. 593, 295 S.E.2d 680 (1982) (mandamus to promulgate administrative regulations regarding corporal punishment of public school children).