Latonya REEVES, George Roberts, Gil Casarez, Jr., Anita Cameron, Rich James, and Mark Simon, Plaintiffs,

v.

QUEEN CITY TRANSPORTATION, Inc., The Public Utilities Commission of the State of Colorado, and the individual Commissioners thereof, Robert J. Hix, Vincent Majkowski, and R. Brent Alderfer, Defendants.

No. Civ.A. 97–B–810.

United States District Court, D. Colorado.

June 22, 1998.

Dale A. Gaar, Denver, CO, for Plaintiffs.

William Higgins, Assistant Attorney General, Denver, CO, Muriel Agnelli, Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendants, the Public Utilities Commission of the State of Colorado and the individual Commissioners thereof, Robert J. Hix, Vincent Majkowski, and R. Brent Alderfer (collectively, "the PUC"), move to dismiss plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(6). The motion is adequately briefed and oral argument will not materially aid its resolution. For the reasons set forth below, I grant the PUC's motion to dismiss.

## I. PLEADING STANDARDS

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). The complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted); *accord Meade v. Grubbs*, 841 F.2d 1512, 1526 (10th Cir.1988). In reviewing the sufficiency of the complaint, a court must presume that the plaintiff's factual allegations are true and construe them in a light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Meade*, 841 F.2d at 1526.

## II. ALLEGED FACTS

I derive the following facts from the complaint. To the extent plaintiffs present matters outside the pleadings in their response brief, I exclude such matters from consideration. *See* Fed.R.Civ.P. 12(b). Plaintiffs are six people with disabilities who use wheelchairs for mobility. Defendant Queen City Transportation, Inc. (Queen City) is a private company that provides public transportation between Denver, Colorado and Colorado's various ski and gambling resorts. Queen City allegedly refused to provide plaintiffs with transportation because of their disabilities on multiple occasions. The PUC issues to certain common carriers certificates declaring that the present or future convenience and necessity requires or will require operation of the carrier. The PUC issued a certificate of public convenience and necessity to Queen City.

Plaintiffs commenced this action on April 21, 1997. Plaintiffs allege two claims against Queen City: (1) discrimination in violation of United State Department of Transportation regulations, found at 49 C.F.R. §§ 37.5(a), 37.5(e), 37.169, and 37.173, implementing the

Americans with Disabilities Act of 1990(ADA), 42 U.S.C. §§ 12101–12213 (1997); and (2) disability discrimination in violation of C.R.S. 24–34–601 (1997). Plaintiffs allege one claim against the PUC, discrimination in violation of a United States Department of Justice regulation, found at 28 C.F.R. § 35.130, also implementing the ADA. Jurisdiction exists pursuant to 28 U.S.C. § 1331.

### III. TITLE II OF THE AMERICANS WITH DISABILITIES ACT OF 1990

Title II of the ADA prohibits "public entities" from discriminating against disabled individuals. A "public entity" is broadly defined under the statute as "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1). For the purposes of this motion, the PUC concedes that it is a "public entity" as defined by the ADA. The PUC also concedes that plaintiffs are qualified individuals with disabilities.

The operative language of Title II states: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Although the ADA does not explicitly define "services, programs, or activities," courts broadly construe Title II as covering a variety of community services and programs. *See Pennsylvania Dept. of Corrections v. Yeskey*, — U.S. —, 118 S.Ct. 1952, 1953, 141 L.Ed.2d 215 (1998) (state prison); *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 44 (2d Cir.1997) (zoning); *Eric L. By and Through Schierberl v. Bird*, 848 F.Supp. 303, 314 (D.N.H.1994) (foster care program); *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach*, 846 F.Supp. 986, 991 (S.D.Fla.1994) (park center); *Independent Housing Services of San Francisco v. Fillmore Center Associates*, 840 F.Supp. 1328, 1344 (N.D.Cal.1993) (bond financing for housing project).

The operative language of Title II, however, must be read in conjunction with applicable implementing regulations. *See Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). Congress directed the Department of Justice (the DOJ) to write regulations implementing Title II's prohibition against discrimination. 42 U.S.C. § 12134. The House Judiciary Committee Report provided:

> Unlike the other titles in this Act, title II does not list all of the forms of discrimination that the title is intended to prohibit. Thus, the purpose of this section is to direct the Attorney General to issue regulations setting forth the forms of discrimination prohibited.

H.R.Rep. 101–485, part III at 52 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 475. In response to this congressional mandate, the DOJ issued regulations defining the forms of discrimination prohibited by Title II of the ADA. Because Congress left to the Attorney General the task of giving meaning to § 12132's broad prohibition of discrimination in public services, DOJ regulations must be "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *accord Bledsoe v. Palm Beach County Soil and Water Conservation Dist.*, 133 F.3d 816, 822–823 (11th Cir.1998); *Helen L. v. DiDario*, 46 F.3d 325, 331 (3d Cir.1995).

### IV. ANALYSIS

Plaintiffs do not allege that the PUC wrongfully denied their application for a certificate of public convenience and necessity to operate as a common carrier. Nor do plaintiffs allege that the PUC's certification standards require certified common carriers to discriminate against qualified individuals with disabilities. The complaint asserts that Queen City, not the PUC, engaged in discriminatory practices. (Compl.¶ 25.) The only conduct on which plaintiffs' premise their complaint against the PUC is its issuance of a certificate of public convenience and necessity to Queen City. (Compl.¶¶ 12, 14, 29–31.) In response to the PUC's motion to dismiss, plaintiffs rely on the following DOJ regulation, which states in relevant part:

A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability ... [a]id or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program; ...

28 C.F.R. § 35.130(b)(1)(v). Just as the ADA does not explicitly define "services, programs, or activities," the DOJ regulations do not explicitly define "aid, benefit, or service" or "program." The PUC contends that Title II and the implementing regulations promulgated by the DOJ apply only to services, programs, and activities of public agencies, not services, programs, or activities of private entities that are certified or licensed by public agencies.

■ Before resolving this issue, I first outline the nature of the PUC. Although the PUC concedes that it is a "public entity" as defined by the ADA, determining the functions of the PUC will assist with resolution of whether the PUC has denied plaintiffs an "aid, benefit, or service" of a program that it provides. By the authority of the Colorado Constitution and the Colorado General Assembly, the PUC regulates the "facilities, service and rates and charges" of public utilities. C.R.S. §§ 40–1–102 & 104(1) (1997); C.R.S. § 40–10–105(2). This authority includes, but is not limited to, the power to issue certificates of public convenience and necessity to common carriers. *Miller Bros., Inc. v. Public Utils. Comm'n,* 185 Colo. 414, 431, 525 P.2d 443, 451 (1974). Review of the PUC's enabling statute and regulations indicates that the PUC certifies, registers, or issues permits to telecommunication service providers, telephone utilities, electric utilities, gas utilities, water utilities, interstate motor vehicle carriers, towing carriers by motor vehicle, common carriers by motor vehicle, and contract carriers by motor vehicle. *See, generally,* Colo. Const. art. XXV; C.R.S. §§ 40–2–101 et seq.; 4 Colo.Code Regs. § 723. The PUC's regulations address public safety and market competition. Generally, the PUC's regulations do not require as a condition of certification that governed entities comply with remedial legislation like the ADA.

■ The PUC's issuance of certificates of public convenience and necessity to common carriers is governed by the doctrine of "regulated monopoly." *Yellow Cab Co-op. Ass'n v. Public Utils. Comm'n,* 869 P.2d 545, 548–549 (Colo.1994). Although the General Assembly adopted a system of "regulated competition" with respect to common carriers in 1967, 1967 Colo.Sess.Laws 974, motor vehicle passenger carriers such as Queen City are still governed by the doctrine of regulated monopoly. *Yellow Cab,* 869 P.2d at 548 n. 5. The doctrine of regulated monopoly requires the PUC to deny an application for common carrier authority unless the existing service is determined to be "substantially inadequate." *Id.; accord Colorado Transp. Co. v. Public Utils. Comm'n,* 158 Colo. 136, 143–144, 405 P.2d 682, 686 (1965). "The existence of an adequate and satisfactory service by motor carriers already in the area is a negation of a public need and demand for added service by another carrier." *Ephraim Freightways, Inc. v. Public Utils. Comm'n,* 151 Colo. 596, 600, 380 P.2d 228, 231 (1963) (citing *Denver and Rio Grande Western R. Co. v. Public Utils. Comm'n,* 142 Colo. 400, 351 P.2d 278 (1960)). A certificate of public convenience and necessity may be sold, assigned, leased, encumbered, or transferred, but only with the PUC's approval. C.R.S. § 40–10–106. *See, generally, De Lue v. Public Utils. Comm'n,* 169 Colo. 159, 168, 454 P.2d 939, 943 (1969).

Based on the salient provisions of its enabling statute and operating regulations, I conclude that the PUC's primary function and activity is certification, registration, and permitting of public utilities. The PUC does not offer, directly or indirectly, telephone services, electric services, motor vehicle services, or any other public utility services or programs to the public. Its function is limited to regulation of private entities and public utilities that offer such services. Having ascertained the nature of the PUC, I return to analysis of Title II.

As noted above, the general prohibition of Title II states: "no qualified individual with a disability shall, by reason of such disability,

be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Although there exists no case precedent in this or any other circuit regarding Title II's application to a public utility commission's act of issuing a certificate of public convenience and necessity, courts have addressed issues similar to those raised by the PUC. Decisions regarding licensure, contracting, procurement, and zoning discuss Title II's limitations and provide guidance.

In *Tyler v. City of Manhattan*, 849 F.Supp. 1429, 1431 (D.Kan.1994), a disabled person brought an action against the city of Manhattan, Kansas seeking declaratory, injunctive, and monetary relief under the ADA. Count three of the plaintiff's complaint alleged that the city entered into licensing and contractual arrangements with local businesses in violation of 28 C.F.R. § 35.103(b)(1), which prohibits discrimination on the basis of disability by a public entity "in providing any aid, benefit, or service ... directly or through contractual, licensing, or other arrangements." Specifically, the plaintiff alleged that the city knowingly issued liquor licenses and building permits for facilities that were not accessible to persons with disabilities. *Id.* at 1441. The plaintiff further alleged that the city failed to evaluate its licensees for compliance with the ADA and failed to require ADA compliance as a condition for licensure. *Id.*

In granting the city's motion for summary judgment, the court stated:

[T]he City correctly argues that the regulations implementing Title II of the ADA do not cover the programs and activities of entities that are licensed or certified by a public entity. *See* 28 C.F.R. § 35.130(b)(6). Although City programs operated under contractual or licensing arrangements may not discriminate against qualified individuals with disabilities, *see* 28 C.F.R. § 35.130(b)(1), "[t]he programs or activities of licensees or certified entities are not themselves programs or activities of the public entity merely by virtue of the license or certificate." *See* 28 C.F.R. Pt. 35, App. A, Section 35.130 (reference to paragraph (b)(6)). Therefore, except to

the extent that plaintiff asserts in Count III that he has been denied access to services, aids, and programs provided by the City under licensing or contractual arrangements, *see* 28 C.F.R. § 35.130(a), (b)(1), the defendant is entitled to judgment as a matter of law on Count III.

*Id.* at 1441–1442. In addition to concluding that liquor licensure and the issuance of building permits do not constitute "services, programs, or activities of a public entity," the court also held that the city need not impose on private establishments, as a condition of licensure, a requirement that they make their facilities physically accessible to persons with disabilities:

[I]ndividuals with disabilities are not denied access to such licensed facilities, or to the claimed benefits flowing from the City's inspection of them, by virtue of any act of the City in the manner it conducts [inspection] activities. Rather, they are excluded from the benefits of the City's inspection and licensing services solely because the licensed structure itself happens to be inaccessible. Title II of the ADA and its implementing regulations prohibit discrimination against qualified individuals only by public entities. *See* 28 C.F.R. § 35.102(a); § 35.130(a). It simply does not go so far as to require public entities to impose on private establishments, as a condition of licensure, a requirement that they make their facilities physically accessible to persons with disabilities.

*Id.* at 1442.

■ The distinction drawn by *Tyler* demonstrates that the scope of Title II is not limitless. The language chosen by Congress in § 12132, "services, programs, or activities of a public entity," and the language chosen by the DOJ in 28 C.F.R. § 35.130(b)(1), "aid, benefit, or service" and "program," limit Title II's application to programs inherent to the public entity. This construction is confirmed by the DOJ's Title II Technical Assistance Manual (Title II TAM), which states in relevant part:

A public entity may not discriminate on the basis of disability in its licensing, certification, and regulatory activities. A person is a "qualified individual with a dis-

ability" with respect to licensing or certification, if he or she can meet the essential eligibility requirements for receiving the license or certification.

\* \* \* \* \* \*

A public entity does not have to lower or eliminate licensing standards that are essential to the licensed activity to accommodate an individual with a disability. Whether a specific requirement is "essential" will depend on the facts of the particular case. Where a public entity administers licensing examinations, it must provide auxiliary aids for applicants with disabilities and administer the examinations in accessible locations.

In addition, a public entity may not establish requirements for the programs or activities of licensees that would result in discrimination against qualified individuals with disabilities. For example, a public entity's safety standards may not require the licensee to discriminate against qualified individuals with disabilities in its employment practices.

ILLUSTRATION: A State prohibits the licensing of transportation companies that employ individuals with missing limbs as drivers. XYZ company refuses to hire an individual with a missing limb who is "qualified" to perform the essential functions of the job, because he is able to drive safely with hand controls. The State's licensing requirements violate title II.

BUT: *The State is not accountable for discrimination in the employment or other practices of XYZ company, if those practices are not the result of requirements or policies established by the State. Although licensing standards are covered by title II, the licensee's activities themselves are not covered. An activity does not become a "program or activity" of a public entity merely because it is licensed by the public entity.*

ADA TAM II–3.7200 (emphasis added). The Title II TAM is persuasive authority unless it is plainly erroneous or inconsistent with the DOJ regulations it interprets. *Innovative Health Systems*, 117 F.3d at 45–46. *See, generally, Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). There is nothing to suggest that the Title II TAM is plainly erroneous or inconsistent with DOJ regulations.

The Title II TAM is consistent with not only 28 C.F.R. § 35.130(b)(1)(v), but also § 35.130(b)(6), which states:

A public entity may not administer a *licensing or certification program* in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. *The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.*

28 C.F.R. § 35.130(b)(6) (emphasis added). The plain language of § 35.130(b)(6) is controlling here. The PUC operates a "certification program," not a transportation program. The PUC's issuance of a certificate of public necessity and convenience to Queen City does not constitute a violation of Title II even if Queen City subsequently engaged in unlawful discrimination. Queen City's alleged discrimination against plaintiffs flows from Queen City's conduct, not the PUC's issuance of a certificate. Further, the alleged discriminatory practices of Queen City are not the result of any requirement or policy established by the PUC. The PUC's ability to certify other motor vehicle common carriers only when the existing service is substantially inadequate does not constitute a policy that necessarily results in disability discrimination. Certainly, a single common carrier can provide adequate, nondiscriminatory service within the framework of a regulated monopoly system.

Plaintiffs contend that the PUC's administration of the regulated monopoly system for motor vehicle common carriers is different from the liquor licensure system at issue in *Tyler*. Plaintiffs argue that the PUC's issuance of a certificate to Queen City created a monopoly and, therefore, the PUC aided discrimination against plaintiffs by providing "significant assistance to an ... organization ... that discriminates on the basis of disability." 28 C.F.R. § 35.130(b)(1)(v). Plaintiffs'

argument, however, ignores the limiting language of § 35.130(b)(1)(v). In its entirety, that regulation states:

A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability ... [a]id or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability *in providing any aid, benefit, or service to beneficiaries of the public entity's program;* ...

28 C.F.R. § 35.130(b)(1)(v) (emphasis added). As noted above, the PUC is not providing the aid, benefit, service, or program at issue. Rather, Queen City's operation of a commuter transportation service constitutes the relevant service or program. Although the PUC's issuance of a certificate of public convenience and necessity may differ from the liquor licensure system at issue in *Tyler*, the same overriding principles derived from statutory and regulatory language apply.

Attempting to distinguish this case from *Tyler*, plaintiffs cite *Independent Housing Services v. Fillmore Center Associates, supra.* In *Fillmore*, the plaintiffs claimed that a city redevelopment agency provided bond financing to the owner of a housing project in violation the ADA because the housing project discriminated against disabled persons. In denying the agency's motion for summary judgment, the court noted the "crucial distinction" that the agency had contracted with the owner of the housing project to provide aid, benefits, or services to beneficiaries of the agency's "program or activity of urban renewal." *Fillmore*, 840 F.Supp. at 1344. *Fillmore* doesn't fit the situation here. The PUC has not entered into a contract or other arrangement with Queen City to provide services to beneficiaries of a PUC program or activity. Transportation is not a program or activity of the PUC.

Nor is this case similar to *Paxton v. State Dept. of Tax and Revenue*, 192 W.Va. 213, 451 S.E.2d 779 (1994). In *Paxton*, the State of West Virginia Department of Tax and Revenue operated a Lottery Commission. The Virginia Supreme Court affirmed the lower court's issuance of a writ of mandamus compelling the Lottery Commission to require that all licensed vendors of lottery tickets provide access to disabled people:

It is clear that the Lottery Commission offers more than a mere license to the entities which are given lottery outlets. This is not like the liquor and building permits issued by the city in *Tyler*, where the city had no control over the premises or services. Here, through its contract vendors the Lottery Commission furnishes the lottery devices and services that allow the licensee to conduct lottery sales. The Lottery Commission is clearly a public entity within the meaning of the Americans with Disabilities Act, and it provides an aid, benefit or service on a continuing basis to its licensee. Therefore, the Lottery Commission comes within the scope of 28 C.F.R. § 35.130(b)(1), which precludes a public entity that provides any aid, benefit, or service from allowing disability discrimination, either through contractual, licensing, or other arrangements.

In reaching this conclusion, we reject the appellant's argument that the lottery is only engaged in a licensing arrangement under 28 C.F.R. § 35.130(b)(6). As we noted earlier, the Lottery Commission does more than merely license lottery locations. It controls and obtains substantial monies from the lottery system.

*Paxton* at 218–219, 451 S.E.2d at 784–785. The Virginia Supreme Court relied heavily on the state statutes that created the Lottery Commission. The Court noted that state statutes charged the Lottery Commission with " 'operation of the state lottery on a continuous basis.' " *Id.* at 217 n. 13, 451 S.E.2d at 783 n. 13 (citing W.VA.CODE § 29–22–9(a)). Further, the Court noted that, "[e]ven before the ADA became law, the Legislature recognized the importance of public accessibility to lottery facilities." *Id.* at 217 n. 13, 451 S.E.2d at 783 n. 13 (citing W.VA.CODE § 29–22–10(a)(4)). This statutory framework compelled the Court to conclude that "the lottery is the service provided by the Lottery Commission." *Id.* at 219, 451 S.E.2d at 785.

In summary, I conclude that plaintiffs fail to state a claim upon which relief can be

granted. The plaintiffs premise their complaint exclusively on the PUC's certification of a public utility. A public utility's activity, however, does not become a "program or activity" of the PUC merely because the PUC's issuance of a certificate of public convenience and necessity. Considering the function and activity of the PUC, its certification of Queen City does not by itself constitute a violation of 28 C.F.R. § 35.130(b)(1)(v) as a matter of law. Thus, I grant the PUC's motion to dismiss. Because I conclude that plaintiff's claim against the PUC fails to state a claim upon which relief can be granted for the reasons set forth above, I do not address the PUC's contention that affording the relief requested by plaintiffs would violate the sovereignty of the State of Colorado in contravention of the Tenth and Eleventh Amendments of the United States Constitution.

## IV. ADMINISTRATIVE ISSUES

■ A review of the record indicates that Queen City is not represented by counsel. On February 18, 1998, I granted the motion to withdraw of Queen City's attorney of record, Muriel Agnelli. The notice of withdrawal, dated January 22, 1998, informed Queen City that it could not appear before this court without an attorney. It has been the law, for the better part of two centuries, that a corporation may appear in federal court only through a licensed attorney. *Osborn v. President of Bank of United States*, 9 Wheat. 738, 22 U.S. 738, 829, 6 L.Ed. 204 (1824); *see also* 28 U.S.C. § 1654 (1997). The purpose of this rule is to guard against the unauthorized practice of law by those who are not subject to the general discipline of the court. *Id.* Absent prompt appearance of substitute counsel, pleadings, motions, and other papers may be stricken, and default judgment or other sanctions may be imposed against Queen City. *See* D.C.COLO.LR 83.5(D). Nonetheless, no substitute attorney has entered an appearance on behalf of Queen City as of today's date. The final trial preparation conference is scheduled for September 2, 1998. Trial is scheduled to commence September 28, 1998.

Magistrate Judge Schlatter held a pretrial conference on February 23, 1998. Despite Ms. Agnelli's previous motion to withdraw and my order granting such motion, she appeared at the pretrial conference. She represented to Magistrate Judge Schlatter that Queen City and plaintiffs reached a settlement. The pretrial order entered February 23, 1998, but without Ms. Agnelli's signature on behalf of Queen City. Magistrate Judge Schlatter entered an order on February 23, 1998, directing plaintiffs and Queen City to finalize their settlement and provide the court with a stipulated motion for dismissal "within ten days." That order also stated: "In the event that settlement is not finalized as between plaintiff and Queen City, substitute counsel for Queen City shall be allowed ten days from this date within which to review and supplement the Pretrial Order."

Plaintiffs then moved for, and I granted, two extensions of this deadline. Pursuant to my order entered March 13, 1998, plaintiffs and Queen City were to file a stipulated motion for dismissal or a supplemental pretrial order on or before April 3, 1998. As of today, the plaintiffs and Queen City have not done so. Thus, I direct plaintiffs to show cause on or before July 2, 1998 why this action should not be dismissed as to Queen City as having been settled with that defendant.

Accordingly, I ORDER that:

(1) the motion to dismiss of defendants Public Utilities Commission of the State of Colorado, Robert J. Hix, Vincent Majkowski, and R. Brent Alderfer is GRANTED;

(2) plaintiffs' third claim for relief is DISMISSED with prejudice;

(3) defendants Public Utilities Commission of the State of Colorado, Robert J. Hix, Vincent Majkowski, and R. Brent Alderfer are DISMISSED as party defendants and AWARDED costs;

(4) the caption of the case is AMENDED to reflect that defendants Public Utilities Commission of the State of Colorado, Robert J. Hix, Vincent Majkowski, and R. Brent Alderfer are no longer parties to this case; and

(5) plaintiffs shall SHOW CAUSE on or before July 2, 1998 why this action should not be dismissed as to defen-

dant Queen City as having been settled with that defendant.