. WIENER, Circuit Judge,
concurring in part and dissenting in part:
I concur in the panel majority’s holding that the named plaintiffs have standing to bring their ADA claims. I respectfully dissent on the merits, however, in the firm conviction that TEA’s involvement in driver education in Texas does constitute a service, program, or activity under Title II of the ADA, which in turn requires TEA to ensure that its licensee driving schools accommodate the deaf. Convinced that the named plaintiffs have stated a claim for which relief may be granted, I would affirm the district court’s judgment denying TEA’s motion to dismiss and permitting the case to proceed on the merits.
1. Service, Program, or Activity
This case turns entirely on whether Texas, through TEA, conducts a service, program, or activity by licensing the driving *259 schools that train all drivers between 17 and 25 years of age who seek driver’s licenses. As the majority opinion acknowledges, neither the statutes and regulations nor the case law provide a precise definition of “services, programs, or activities.”[1] We differ, however, because the guidance to be derived from these sources inexorably leads me to the conclusion that the phrase is sufficiently broad and flexible to apply to TEA’S licensing in this case. The indisputable truism that virtually every adult, including those between 17 and 25 years old, must have the opportunity to be licensed to drive a car (or, in Texas, a truck), given driving’s unique and indispensable importance in their daily lives, confirms to me beyond cavil that TEA does in fact engage in the public “program” of driver education. That in turn warrants our mandating that TEA ensure that every driving school accommodates deaf students.
2. Contract; Agency; Licensing
The majority opinion rests its holding on its perceived distinction between contractual and agency relationships, on the one hand, and licensing relationships on the other. This to me is a classic distinction without a difference. First and foremost, no such dichotomy appears in the text of Title II.[2] As for the implementing regulations, if the term “services, programs, or activities” hinged on the technical legal formalities of agency or contract and distinguished them based on the formalities of licensing, such a clear rule would surely be set out in the text, not relegated to subtext. The fact that 28 C.F.R. § 35.130 is couched in the language of standards, not rules, suggests that DOJ interprets Title II to encompass a greater set of public/private interactions than the majority opinion recognizes. Indeed, the regulations explicitly forbid public entities from engaging in discrimination through “contractual, licensing, or other arrangements.” [3] Not only does 28 C.F.R. § 35.130(b)(1) specifically include licensing regimes, but the breadth of the additional, catch-all phrase, “other arrangements,” cuts against the majority’s narrow construction that only contractual or agency relationships qualify as programs and that licensing does not. To me, it’s not a matter of undefined labels but of the substance of each particular public/private relationship.
I also read DOJ’s Technical Assistance Manual as supportive of a more expansive view of “services, programs, or activities.” Surely, if the rule to be gleaned from the four examples in section II-1.3000 were that only contractual or agency relationships between public and private entities could invoke dual Title II and Title III obligations, but that licensing could not, the manual would have stated so plainly. Instead, the manual makes only the general point that, “[i]n many situations, however, public entities have a close relationship to private entities that are covered by title III, with the result that certain activities may be at least indirectly affected by both titles.”[4] “Close relationship” is not synon *260 ymous with or restricted to “contractual or agency relationship,” and I am reluctant to so narrow DOJ’s language. Rather, I see the four illustrations that follow not as delineating the outer limits of what constitutes a “close relationship,” but as presenting four non-exclusive, typical examples of public-private interactions-non-exclusive examples that occur often in the real world and thus are useful to include as illustrations. The driver education system at issue here, however, is sui generis — atypical if not unique — so it is unsurprising that the manual presents no close analogy. What the manual does do, however, is instruct us to focus on the closeness of the particular relationship — here, the one between TEA and private driving schools— not on the legalistic labeling of the relationship as licensing.
Finally, the panel majority’s perceived distinction between contractual and agency relationships and licensing relationships is nowhere apparent in the limited case law on this issue. It may well be that a contractual or agency relationship is a sufficient condition to finding that a public entity’s program encompasses a private entity’s activities, but it is neither the only one nor a necessary one.[5] The critical issue is not whether a contract exists,[6] but (1) whether a private party services the beneficiaries of the public entity’s program, and (2) how extensively the public entity is involved in the functions and operations of the private entity. If the private entity does so serve, and the public and private entities are closely intertwined, then under those particular circumstances, the private entity’s activities might be fairly considered an integral and inseparable part of the public entity’s program.
3. TEA and Driving Schools Are Inextricably Intertwined
The crux of the plaintiffs’ case (and mine!) is that, even though the driving schools perform the actual day-to-day instruction, instruction is but one component of the broader program of driver education that is continually overseen and regulated in discrete detail by TEA. When Chapter 1001 of the Texas Education Code is con *261 sidered as a whole, it reveals that TEA superintends a wide-ranging driver training program in support of Texas’s overarching policy goal of ensuring safe roads for all. Chapter 1001 does not merely establish TEA’s authority over driver education — and consequently, its role as gatekeeper to the uniquely pervasive and indispensable state function of licensing its drivers-but also the agency’s role in ensuring driving safety. The named plaintiffs do not discuss driving safety schools, but it is notable that Chapter 1001 gives TEA oversight of both driver education and driving safety, under the general umbrella of driver training.[7]
TEA plays a significant hands-on role in licensing drivers, but its role in driving safety is anything but remote or marginal. For example, Texans who receive specified minor traffic tickets may have those tickets dismissed if the drivers complete a driving safety course certified and licensed by TEA.[8] The way that the state interfaces driver training and the receipt of state benefits indicates that its intimate participation at all levels of the private driving school industry is more than merely regulatory. Through TEA, the state employs and manages this industry to achieve its own public ends. Again, the fact that the state’s active involvement in this industry is labeled licensing does not diminish, much less block, its qualifying as a program of the state for the purposes of the ADA.
4. TEA’s Role
The powers granted to TEA in Chapter 1001 further support the view that private driving instruction forms one component of an overall state program. This is because TEA exerts more rigorous oversight of providers of driver education than would be expected in most run-of-the-mill licensing regimes. Every driving school’s curriculum must be approved by TEA, and the agency “designate^” the textbooks that may be used.[9] Furthermore, TEA’s enforcement powers over driver education schools are broad and varied[10] — —its power to order a peer review, for example, suggests a greater degree of involvement in the driving schools’ operations than is typical of a plain vanilla licensing arrangement.[11] The requirement that driving *262 school owners and staff be of “good reputation and character” signals a heightened level of concern for the reliability of these schools’ services — a concern that is consistent with TEA as a public provider of a social services program.[12] Similarly, the fact that each driver education school must post a significant bond, payable to TEA for its direct use in paying refunds to students, portrays a higher and more intimate level of agency involvement in these licensees’ activities than would be expected if TEA were purely a hands-off licensing entity.[13] And TEA has the right to inspect every school physically at least once a year as a condition of license renewal[14] — more frequently if the school has a history of regulatory violations.[15]
Beyond TEA’S intertwined involvement with driver education schools, however, is the fact that through TEA the state also employs driver training to teach civic responsibility, including lessons having nothing to do with the mechanics of driving. Chapter 1001 requires TEA to ensure that information about litter prevention[16] and organ donation[17] is included in all driving courses certified by the agency. That the Texas Legislature has chosen to promote these important civic and community values through the vehicle of driver training is another indication that the private driving school industry participates in a public program of TEA.[18]
All of this makes abundantly clear that driver education is not merely a passively licensed, private, for-profit industry, but constitutes a means by which TEA substantively and substantially effectuates the policy goals that the state has charged it with implementing and maintaining. The fact that driver education forms part of the academic curriculum in some public schools only reinforces the conclusion that this entire infrastructure is truly a “program” of the state of Texas.
As the panel majority acknowledges, 28 C.F.R. § 35.130(b)(l)(v) is the regulation that is most relevant to this case. It contemplates precisely the instant situation: A public entity may well discriminate indirectly by furnishing significant assistance to a private entity that discriminates directly by failing to provide the public entity’s program to disabled beneficiaries. The regulation, in other words, covers a public entity that farms out the practical implementation of its program to private *263 entities while retaining and exercising considerable oversight, regulation, and other substantive involvement. In this case, the driving school students are the direct beneficiaries of TEA’s program, and TEA furnishes operating licenses and course completion certificates to private schools that in turn discriminate on the basis of disability. In my view, the plaintiffs have stated a viable cause of action: The State of Texas cannot legislatively mandate driver education, then evade ADA responsibility via a “flea-flicker” lateral from TEA to private licensees.
5. “Parade of Horribles” Is Inapt
TEA claims that affirming the district court in this case could lead to requiring the state to police ADA compliance by all heavily regulated, licensed industries, such as massage parlors and tattoo artists — a typical “parade of horribles” frequently advanced by desperate public defendants. That may well be, but the one and only issue before us today is the discrete driver education scheme mandated by the Texas legislature and created and administered by TEA. It is sufficiently distinct and distinguishable from all others that affirming the district court surely will not open those floodgates. There exist obviously meaningful differences between this particular public/private operation and virtually every other private operation that Texas licenses. TEA’s role is not just about consumer protection, as is the focus of the several occupational codes cited by the state. I repeat here for emphasis that, in this day and age, the driving of private and personal vehicles is a uniquely important, pervasive, and indispensable entitlement, and driving responsibly is a civic duty that the state seeks to promote with this unique regulatory scheme that it entrusts to TEA. Nothing about this is changed by the fact that state-licensed driver education schools happen to be private enterprises.
To illustrate this distinction between driver education and essentially all other heavily regulated businesses and industries, consider a hypothetical world in which every driver education school in Texas shuts down, so that no person under the age of 25 could obtain a driver’s license via private instruction. Texas would undoubtedly fill the void itself — perhaps by adding courses at community colleges and expanding the driver education programs that currently exist in its public schools. But if, by contrast, each and every massage therapist or tattoo artist school in Texas were to close, the state surely would not respond by entering the business of training massage therapists or tattoo artists. Unlike driver education schools, those industries do not serve as private mechanisms for achieving public ends and public policy.
Viewing the case law from this perspective, the distinction becomes even more apparent. Liquor stores,[19] buses to gambling and ski resorts,[20] and taxi cabs[21] are not services of the state. Like Kansas, Colorado, and New York, Texas might well regulate these industries, but it is not likely to replicate them. Again, the feature that sets driver education apart from all the rest is the pervasiveness of driving private vehicles in a state like Texas. States regulate other industries to prevent unlicensed operators from doing harm. In contrast, driver education alone is a positive good and an end unto itself. Texas *264 has chosen to educate drivers via private driving schools, and it regulates this private industry not simply to protect consumers from unlicensed operators, but first and foremost to ensure that important training goals for this large segment of the state’s adult population are met to the state’s satisfaction. Texas has an inherent interest in driver education that it does not have in any of the other licensed endeavors, accounting for its extensive involvement through TEA.[22]
Finally, I acknowledge the concern that requiring TEA to take a more active role in promoting handicap accessibility in driver education would unduly expand its role. True, it may well impose an unanticipated ADA burden on the agency. Yet Congress made the conscious calculation to impose this burden on public entities. In light of this nation’s unseemly history of systematically excluding persons with disabilities from public life and public activities, Congress intentionally wrote the ADA “to provide a clear and comprehensive national mandate for the elimination of discrimination.”[23] It might not be convenient for TEA to require ADA compliance by its licensed driver education schools, but the ADA’s sweeping purpose is clear.[24] And, after all, TEA may rely on the ADA’s safety valve of reasonableness. Although' TEA is obligated to make “reasonable modifications in policies, practices, or procedures,” if it finds that such modifications are too strenuous, it may “demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity,” and be excused from compliance.[25] A public entity’s obligations under Title II are broad, but they are not unlimited.
For the foregoing reasons, I respectfully dissent from the panel majority’s reversal of the district court’s denial of TEA’S motion to dismiss.

. 42 U.S.C. § 12132; see also 28 C.F.R. § 35.130.

. See 42 U.S.C. § 12132. This distinction is also entirely absent from the text of the Rehabilitation Act, which prohibits discrimination in the implementation of “any program or activity” by entities receiving federal assistance. See 29 U.S.C. § 794(a); see also Frame v. City of Arlington, 657 F.3d 215, 223 (5th Cir.2011) (en banc) ("The ADA and the Rehabilitation Act generally are interpreted in pari materia”).

. 28 C.F.R. § 35.130(b)(1) (emphasis supplied).

. Dep't of Justice, The Americans with Disabilities Act Title II Technical Assistance Manual *260 Covering State and Local Government Programs and Services § II-1.3000 (1993) (emphasis supplied), available at http://www.ada.gov/ taman2.html.

. See Paulone v. City of Frederick, 718 F.Supp.2d 626, 636 (D.Md.2010) (allowing a Title II claim against a city for its failure to ensure that private entities participating in the city's alcohol awareness program were ADA compliant, though no contract appears to have existed between the city and the private entities).

. See Castle v. Eurofresh, Inc., 731 F.3d 901, 910 (9th Cir.2013) ("Title II's obligations apply to public entities regardless of how those entities chose to provide or operate their programs and benefits.” (emphasis supplied)). The majority appears to read Independent Housing Services of San Francisco v. Fillmore Center Associates, 840 F.Supp. 1328, 1344 (N.D.Cal.1993), as making a “crucial distinction” between a state development agency, which might be liable under Title II for a private housing development’s discriminatory practices, and a fire department, which would not be (even if it saved the development from a fire, thus rendering it “significant assistance”), on the basis of the agency's contract with the housing development, and the fire department’s lack of a contract. The court in Independent Housing noted "that the fire department has not contracted with [the housing development] for [it] to provide any aid, benefit, or service to beneficiaries of the fire department’s program,” whereas the state agency "has contracted with [the housing development] for [it] to provide aid, benefits, or services to beneficiaries of the [a]gency's redevelopment program.” Id. In my view, the "crucial distinction” in Independent Housing is the fact that the public entity used a private entity to implement its urban renewal program, not that this arrangement was formalized in a contract.

. See Tex. Educ.Code § 1001.001(9) (defining a "driver training school” as a "driver education school or driving safety school”).

. See Information for Driving Safety Class Participants, Region 13, http://www4.escl3.ne1/ drivers/faqs-drivers/idsinfo (last visited Mar. 24, 2015). Some automobile insurance companies also provide discounts for individuals who have completed such a course, a public-private interaction that TEA facilitates. See id.; see also Educ. § 1001.105 (requiring TEA to "enter into a memorandum of understanding with the Texas Department of Insurance for the interagency development of a curriculum for driving safety courses”).

. Educ. § 1001.101(a).

. See id. § 1001.454(a) ("The commissioner may revoke the license of a driver training school ... or may place reasonable conditions on the school ... if the commissioner has reasonable cause to believe that the school ... has violated [Chapter 1001 or a rule adopted under it]."); id. § 1001.456(a) ("[T]he agency may, without notice: (1) order a peer review; (2) suspend the enrollment of students in the school or the offering of instruction by the instructor; or (3) suspend the right to purchase driver education certificates.”); id. % 1001.553 (noting that the commissioner may separately impose administrative penalties of up to $1,000 per day per offense on schools found in violation of the chapter or the rules adopted under it); see also id. § 1001.153(a) (allowing the commissioner to set a fee for investigating complaints against a school, payable by schools that are ultimately found to be at fault).

.See id. % 1001.456(a). A peer review is an "objective assessment of the content of the school’s ... curriculum and its application,” *262 "conducted by a team of knowledgeable persons selected by the agency,” and paid for by the school under review. Id. § 1001.456(c).

. Id. § 1001.204(9).

. See id. § 1001.207.

. See id. § 1001.303.

. See id. § 1001.454(c).

. See id. § 1001.107.

. See id. § 1001.108.

. In section 1001.111, there is even more evidence that the state sees good driving habits as a component of good citizenship. For drivers younger than 25, driving safety courses take on the attributes of civic education. Students are not just instructed on traffic rules. In addition, they are educated on “the role of peer pressure,” id. § 1001.111(b)(2)(D), "the effect of poor driver decision-making on [their] family, friends, school, and community,” id. § 1001.111(b)(2)(E), and the importance of assertiveness, as drivers and as passengers, see id. § 1001.111(b)(2)(F). They must also sign “a written commitment ... to family and friends that the student will not engage in dangerous driving habits.” Id. § 1001.111(b)(3). Implicit in these requirements is the idea that a responsible driver is a responsible citizen. To be clear, driver education courses, not driving safety courses, are at issue in this case; Chapter 1001, however, covers both driver education and driving safe *263 ty as two parts of an overall driver training program managed by TEA.

.See Tyler v. City of Manhattan, 849 F.Supp. 1429 (D.Kan.1994).

. See Reeves v. Queen City Transp., Inc., 10 F.Supp.2d 1181 (D.Colo.1998).

. See Noel v. N.Y.C. Taxi & Limousine Comm’n, 687 F.3d 63 (2d Cir.2012).

.Cases in which Title II has been held to apply to public entities supervising the activities of private industries consistently involve issues of inherent state interest, such as health care and education. See, e.g., Paulone v. City of Frederick, 718 F.Supp.2d 626, 636 (D.Md.2010) (allowing a deaf plaintiff’s Title II claim to proceed after a city did not provide interpreters to probationers who were required to attend private alcohol awareness classes, including a victim impact panel sponsored by Mothers Against Drunk Driving); Disability Advocates, Inc. v. Paterson, 598 F.Supp.2d 289, 317-18 (E.D.N.Y.2009) (ruling that Title II covered a state entity that licensed private entities to operate adult homes for individuals with disabilities).

. 42 U.S.C. § 12101(b)(1) (emphases supplied).

. Frame v. City of Arlington, 657 F.3d 215, 223 (5th Cir.2011) (en banc) (“The ADA is a 'broad mandate’ of comprehensive character’ and sweeping purpose’ intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.’ ” (quoting PGA Tour, Inc. v. Martin, 532 U.S. 661, 675, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001))).

. 28 C.F.R. § 35.130(7).