155 F.3d 35
 UNITED STATES of America, Plaintiff-Appellee,
v.
John ALLEN and Daniel Finley Allen & Co., Inc.,
Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
John PAGANO, Ace Garbage and Garbage and Rubbish Removal,
Inc., and Mets Roll-Off Service, Inc.,
Defendants-Appellants.
 Docket Nos. 97-6254, 97-6274.
 United States Court of Appeals,
Second Circuit.
 Argued April 27, 1998.
Decided Aug. 6, 1998.
 
 Stephen P. Scaring, Garden City, NY (Steven N. Nachman, Garden City, NY, on the brief), for defendants-appellants John Allen, et al.
 Judd Burstein, New York City (Robert N. Fass, Marc Fernich, Burstein & Fass, New York City, on the brief), for defendants-appellants John Pagano, et al.
 Christopher G. Lehmann, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty., Deborah B. Zwany, Asst. U.S. Atty., Brooklyn, NY, on the brief), for appellee.
 Before: NEWMAN and LEVAL, Circuit Judges, and WEXLER,* District Judge.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 This case primarily concerns the appropriateness of summary judgment in resolving the issue of whether defendants in a civil case under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), see 18 U.S.C. § 1964, have exercised the requisite control over the affairs of an alleged RICO enterprise to incur liability for conducting the enterprise's affairs. Two sets of defendants, (i) John Pagano, Ace Garbage and Rubbish Removal, Inc. ("Ace Garbage"), and Mets Roll-Off Service, Inc. ("Mets Roll-Off") (collectively, the "Ace Defendants"), and (ii) John Allen and Donald Finley Allen & Co., Inc. ("DAF") (collectively, the "Allen Defendants"), appeal from orders of the District Court for the Eastern District of New York (Leo I. Glasser, District Judge), entered October 2, 1997. The District Court granted summary judgment for the United States, the plaintiff in this civil RICO action, and ordered various forms of injunctive relief, as well as the disgorgement of defendants' illegal profits.
 
 
 2
 All the Appellants contend that genuine issues of disputed fact preclude summary judgment for the Government. The Allen Defendants also challenge the District Court's rejection as a matter of law of their defenses of extortion and coercion. We conclude that these defenses were properly rejected but that summary judgment was not warranted on the issue of the Appellants' liability, and we therefore affirm in part, vacate in part, and remand.
 
 Background
 
 3
 The complaint. In 1989, the Government filed this civil RICO action against 112 defendants involved in the solid waste carting industry on Long Island. Named as defendants were alleged organized crime families, a trade association, a labor union, carting firms and their officers and directors, and a number of town employees who were alleged to have taken bribes for permitting trucks loaded with solid waste to be underweighed at the scalehouse of the Oyster Bay landfill. Although the case is still pending in District Court, its scope has been substantially narrowed, as a result of settlements and the granting of various motions for summary judgment.
 
 
 4
 The core of the complaint was the alleged effort--beginning in the 1950s--of successive associations of Long Island carters to control the carting industry by setting up a "property rights" regime. Carters were allegedly assigned "rights" to service particular customers or geographic areas. The system allegedly operated to suppress competitive pricing, and organized crime elements used violence to enforce the "property rights" regime. In addition to the formation and enforcement of this cartel, the complaint alleged that "carting industry racketeers have, either singly or in concert, used their control, power or money to corrupt public officials by offers of bribes or by rewarding misconduct, in return for actions by these officials which benefit the corrupt businesses."
 
 
 5
 The complaint alleged the existence of two overarching RICO "enterprises." See 18 U.S.C. §§ 1961(4), 1962. First, it identified the Private Sanitation Industry Association of Nassau/Suffolk, Inc. ("PSIA"), and characterized it as "an association organized, existing and operating for the purpose of controlling the solid waste disposal industry on Long Island." Second, it identified a group that it termed the "Carting Industry Enterprise" ("CIE"), composed of all defendants together with other unnamed "entities in which defendants have an interest." The CIE was described as "associated in fact for the purpose of controlling the solid waste disposal industry on Long Island."
 
 
 6
 While numerous other defendants were alleged to have used violence and intimidation to enforce the carters' "property rights" system, the alleged predicate acts of the Appellants were limited to bribery of workers at the Oyster Bay town dump. The Appellants were alleged to have conferred "bribes and rewards" on dump employees, in exchange for the employees' underreporting the weight of the Appellants' trucks, thereby undercharging them for fees for dumping at the landfill. Although the complaint characterized this activity as racketeering acts under state law punishing both bribery and grand larceny, the Government defends the challenged rulings on appeal by contending that the Appellants' predicate acts were only bribery. See 18 U.S.C. § 1961(1)(A) (state law offenses qualifying as "racketeering activity" include bribery but not theft).
 
 
 7
 The complaint alleged violations of RICO's substantive and conspiracy provisions. See 18 U.S.C. § 1962(c), (d). However, after the Court granted the defendants' motion to dismiss the conspiracy count without prejudice, against all but three defendants (none of whom is involved in the instant appeal), the Government elected not to replead this count. Accordingly, only the substantive claim under section 1962(c) remains at issue on this appeal.[1]
 
 
 8
 The Government and the Defendants-Appellants cross-moved for summary judgment. The following facts, unless otherwise noted, are undisputed.
 
 
 9
 The Ace Defendants. Ace Garbage and Mets Roll-Off are New York corporations. Ace is owned equally by Pagano and Joseph Petrizzo, who serve as president and vice-president, respectively. Mets Roll-Off is wholly owned by Petrizzo. However, because the entities are run as a single operation, the parties have consented to their being treated interchangeably.
 
 
 10
 The PSIA was organized in 1979 as a trade association of those engaged in the business of solid waste collection, transportation, and disposal on Long Island. Both Ace Garbage and Mets Roll-Off were members of the PSIA from its inception until 1989 and paid dues and assessments during that period. The parties agree that Petrizzo attended certain PSIA meetings; however, the parties appear to disagree over the extent to which he was involved in PSIA decision-making. Petrizzo's daughter, Patricia, submitted an affidavit averring that the Ace Defendants were only "passive" members of the PSIA. She acknowledged that she attended some PSIA meetings with her father, but stated that these consisted of nothing more than informational presentations and exchanges of pleasantries.
 
 
 11
 Ace Garbage and Mets Roll-Off also became members of a sub-group of PSIA--the "Oyster Bay PSI Committee" (the "OB-PSI Committee"). The parties agree that the OB-PSI Committee was specifically concerned with protecting and representing the interests of those of its members who used the Oyster Bay dump. The Appellants maintain, however, that none of these objectives was illegal and that their involvement extended only to receiving mailings.
 
 
 12
 In any event, it is undisputed that from at least January 1982 until February 1985, Ace Garbage and Mets Roll-Off, along with other carting companies, made regular payments to workers at the municipal dump, in exchange for underweighing the trucks. This practice, known as "slipping the scale," was accomplished by allowing the truck to pull only partially onto the scale before the weight was measured. Ace Garbage and Mets Roll-Off together paid bribes of $100 per scalehouse employee every two months, and gave an additional $100 to each employee at Christmas. The only representative of the companies specifically identified as making these payments was Pagano. In October 1986, Ace Garbage pled guilty to a state-law misdemeanor charge of theft of services, in connection with its activities at the Oyster Bay dump.
 
 
 13
 The Allen Defendants. DAF is a New York corporation, wholly owned by Sarah Allen, who is a defendant in this action, but not an appellant. Prior to its incorporation in 1984, DAF was operated as a sole proprietorship. During the period relevant to this action, DAF was operated on a day-to-day basis by Sarah Allen and her sons, John and Daniel Allen. DAF was a dues-paying member of the PSIA during 1980 and 1981, but stopped paying dues as of January 1, 1983.
 
 
 14
 At some point in either 1982 or 1983, John Allen was waiting in line at the municipal dump and observed that all the trucks ahead of him were allowed to slip the scale. Thereafter, he confronted the dump weight-master, Joseph Vittorio, and told him that he would "squeal on the whole operation at Oyster Bay" if DAF was not treated in the same manner as the other companies using the dump. The dump employees then regularly allowed DAF to slip the scales, in exchange for cash payments, meals, and alcohol. In October 1986, DAF pled guilty to a state-law misdemeanor charge of theft of services, in connection with its activities at the Oyster Bay dump.
 
 
 15
 In separate rulings, each entered October 2, 1997, the District Court granted the Government's summary judgment motion in each case. The Court also ordered the Ace Defendants and the Allen Defendants to disgorge all gains that resulted from their bribery scheme. The Court did not quantify these sums, and the parties apparently apprehend that these sums are to be determined at a later hearing. The Court also issued injunctive relief. Pagano was enjoined from engaging in any activities in the waste removal and disposal industry. Although the other Appellants--Ace Garbage, Mets Roll-Off, DAF, and John Allen--were not prohibited from working in the industry, they were subjected to the Carting Industry Monitorship program and were ordered to pay all reasonable costs of the Monitorship. Additionally, the Allen Defendants were enjoined from any future participation in any waste trade association.
 
 Discussion
 I. Sua Sponte Consideration of Jurisdiction
 
 16
 The two sets of appellants present significantly different theories of appellate jurisdiction. The Allen Defendants assert that the District Court entered a "final summary judgment" and that this Court therefore has appellate jurisdiction under 28 U.S.C. § 1291. This claim is problematic for at least two reasons. First, the action remains pending against other defendants who are not parties to this appeal, and the District Court did not enter a separate, final judgment as to the Defendants-Appellants pursuant to Fed.R.Civ.P. 54(b). Accordingly, there is no "final judgment" from which section 1291 would give the Appellants a present right to appeal. Second, because the Court ordered, among other relief, disgorgement of the Appellants' ill-gotten profits, no final judgment could be entered until those profits were calculated. See, e.g., In re Fugazy Express, Inc., 982 F.2d 769, 775 (2d Cir.1992) (outside the bankruptcy context, the following are not appealable as final orders: (i) order granting summary judgment on issue of liability, but not calculating damages, (ii) order determining liability, but directing accounting, or (iii) order finding party in contempt, but not determining the sanction).
 
 
 17
 The Ace Defendants correctly assert that this Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1), which generally confers jurisdiction on Courts of Appeals over "[i]nterlocutory orders of the district courts ... granting, continuing, modifying, refusing or dissolving injunctions." We have jurisdiction to review the District Court's ordering of injunctive relief, and additionally "may consider the underlying 'merits of the case, to the extent they relate to the propriety of granting ... injunctive relief,' " Etuk v. Slattery, 936 F.2d 1433, 1443 (2d Cir.1991) (citation omitted).
 
 
 18
 We therefore have jurisdiction to review the merits of the District Court's determination that the Government was entitled to summary judgment on the issue of Appellants' RICO liability since this determination served as a basis for the Court's issuance of injunctive relief. However, there are two remaining jurisdictional wrinkles. First, this Court has jurisdiction to consider only (i) the propriety of injunctive relief and (ii) the merits to the extent necessary to review issuance of the injunction. Since the disgorgement order is not part of the injunction and since that order's propriety need not be decided to determine the propriety of the injunction, the disgorgement order is not reviewable as such. However, since we conclude, upon review of the injunction, that summary judgment for the Government was inappropriate, the disgorgement remedy will necessarily be invalidated for now since it too rests upon the summary judgment ruling.
 
 
 19
 A second jurisdictional issue arises from the fact that the Ace Defendants purport to appeal only from an order "entered ... on September 30, 1997." While the docket sheet does not indicate that any order was entered on September 30, 1997, the Ace Defendants presumably refer to the Court's order dated September 30, 1997 (and shown on the docket sheet as entered October 2, 1997), which granted the Government's motion for summary judgment against them. The problem is that the only remedy mentioned in this order is disgorgement. Subsequently the Court issued an injunction against the Ace Defendants in an order dated October 6, 1997, and entered on October 9, 1997.
 
 
 20
 If we construed the Ace Defendants' notice of appeal strictly,--i.e., as an appeal only from the District Court's September 30, 1997, order--then they would be unable to invoke jurisdiction under section 1292(a). However, since it is evident that the Ace Defendants wish to seek review of the injunction, which is appealable under section 1292(a), and since the disgorgement order was issued in contemplation of the injunction, we will deem their notice of appeal to be a notice of appeal of the injunction.
 
 
 21
 II. Merits of Summary Judgment on RICO Liability
 
 
 22
 The basic facts underlying the Appellants' bribery of officials at the Oyster Bay dump are essentially undisputed. What is at issue is whether these acts, under the circumstances in which they were done, permit different factual inferences as to whether the Appellants have thereby "conduct[ed]" the affairs of a RICO enterprise within the meaning of section 1962(c).
 
 A. Conducting a RICO enterprise
 
 23
 A violation of 18 U.S.C. § 1962(c) "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (footnote omitted). The Appellants contend that the Government has failed to adduce evidence that conclusively demonstrates that they "conduct[ed]" the affairs of either the PSIA or the CIE through the admitted acts of bribery. They rely on Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), in which the Supreme Court explained that in order to "conduct or participate directly or indirectly, in the conduct of [an] enterprise's affairs," 18 U.S.C. § 1962(c), "one must participate in the operation or management of the enterprise itself," Reves, 507 U.S. at 185, 113 S.Ct. 1163, and play "some part in directing the enterprise's affairs," id. at 179, 113 S.Ct. 1163.
 
 
 24
 The Appellants contend that the undisputed facts at most permit an inference that they were involved in the management or operation of the RICO enterprises, but also permit the contrary inference that, although involved in the bribery activity in which the enterprises were engaged, they took no part in the direction of such activities. The Ace Defendants argue that the payment of bribes is insufficient to compel a finding that they directed the enterprises' activities, and that the only evidence tying them to PSIA decision-making is that Joseph and Patricia Petrizzo sometimes attended PSIA meetings. They contend, relying on Patricia Petrizzo's affidavit, that their role in the PSIA was "passive."
 
 
 25
 The Allen Defendants argue that the evidence suggests only that they accidentally discovered the bribery scheme, and that their participation was limited to insisting that the dump workers give them corrupt benefits on the same terms as those given to the members of the enterprise. Accordingly, they argue that they cannot be understood to have "operated" the enterprise whose scheme they envied and then imitated.
 
 
 26
 The Government contends that the Appellants' admitted bribery suffices to establish that they "conduct[ed]" the affairs of the enterprise. The Government relies on a number of post-Reves cases in which this Court has affirmed criminal RICO convictions, despite a contention that the defendants were merely low-level members in the enterprise. See United States v. Miller, 116 F.3d 641, 671-73 (2d Cir.1997); United States v. Workman, 80 F.3d 688, 695-98 (2d Cir.1996); United States v. Masotto, 73 F.3d 1233, 1238-39 (2d Cir.1996); Napoli v. United States, 45 F.3d 680, 683-84 (2d Cir.1995); United States v. Wong, 40 F.3d 1347, 1371-74 (2d Cir.1994); United States v. Thai, 29 F.3d 785, 816 (2d Cir.1994). And the Government notes that only once, in United States v. Viola, 35 F.3d 37 (2d Cir.1994), has this Court reversed a conviction on the basis of Reves. In Viola, the Court characterized the appellant--a janitor and handyman for the enterprise, who had also transported stolen goods on orders from his superiors--as outside "the circle of people who operated or managed the enterprise's affairs." Id. at 43. The Court elaborated:
 
 
 27
 Although Reves still attaches liability to those down the "ladder of operation" who nonetheless played some management role, it is plain to us that, since Reves, § 1962(c) liability cannot cover [this defendant]. [He] was not on the ladder at all, but rather as the [kingpin's] janitor and handyman, was sweeping up the floor underneath it.
 
 
 28
 Id.
 
 
 29
 To determine whether these opposing contentions frame a factual dispute that precludes summary judgment, we start with the Supreme Court's elucidation in Reves of the statutory phrase that renders it unlawful "to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs."[2] 18 U.S.C. § 1962(c). The Court explained that it must read "conduct" "to include an element of direction." Reves, 507 U.S. at 178, 113 S.Ct. 1163 (emphasis added). The Court then elaborated:
 
 
 30
 Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs.
 
 
 31
 Id. at 179, 113 S.Ct. 1163. On this understanding of the statutory language, the Court upheld the Eighth Circuit's liability standard used in Reves--participation in the operation or management of the enterprise, see Bennett v. Berg, 710 F.2d 1361, 1364 (8th Cir.1983) (in banc)--because the " 'operation or management' test expresses [the 'directing'] requirement in a formulation that is easy to apply." Reves, 507 U.S. at 179, 113 S.Ct. 1163.
 
 
 32
 From the Supreme Court's explanation in Reves it is evident that its endorsement of the Eighth Circuit's "operation or management" test did not use the word "operat[ing]" in the sense of "doing" (as in "he operated the lathe") but in the sense of "directing" (as in "he operated the business of the enterprise").[3] The Court acknowledged, however, that those who "operate" or "direct" a RICO enterprise sufficiently to "conduct" its affairs within the meaning of RICO need not be "upper management," but might also be "lower rung participants in the enterprise who are under the direction of upper management." Id. at 184, 113 S.Ct. 1163. Left unclear was whether such lower rung participants must themselves play some "direct[ing]" role, or need only be acting under the direction of upper management.
 
 
 33
 There is language in the opinions of several appellate courts, including our own, from which both sides on this appeal can take comfort. For example, we have said that "Reves makes it clear that a defendant can act under the direction of superiors in a RICO enterprise and still 'participate' in the operation of the enterprise within the meaning of § 1962(c)," Wong, 40 F.3d at 1373, but we have also said that "[s]ince Reves, it is plain that the simple taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." Viola, 35 F.3d at 41. Compare MCM Partners v. Andrews-Bartlett & Associates, 62 F.3d 967, 978-79 (7th Cir.1995) (approving view that " 'the "direction" requirement includes both those who direct, as well as those who take direction' ") (quoting Daniel R. Fischel & Alan O. Sykes, Civil RICO After Reves: An Economic Commentary, 1993 Sup.Ct. Rev. 157, 192), United States v. Starrett, 55 F.3d 1525, 1548 (11th Cir.1995) ("[W]e agree with the First Circuit that one may be liable under the operation or management test by 'knowingly implementing decisions, as well as by making them.' ") (quoting United States v. Oreto, 37 F.3d 739, 750 (1st Cir.1994), and United States v. Oreto, 37 F.3d 739, 750 (1st Cir.1994) (defendant may participate in conduct of enterprise "by knowingly implementing decisions, as well as by making them")), with University of Maryland v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1538-39 (3d Cir.1993) ("Under [Reves ] not even action involving some degree of decisionmaking constitutes participation in the affairs of an enterprise.").
 
 
 34
 In most of the cases in which we have held lower level employees to be RICO participants, the defendant was shown to have played some management role in the enterprise. See Miller, 116 F.3d at 673; Workman, 80 F.3d at 697; Masotto, 73 F.3d at 1239; Thai, 29 F.3d at 816. In Napoli, the defendants--investigators working pursuant to directions from attorneys in their firm to bribe witnesses and falsify evidence supporting tort claims--though not acting in a managerial role, "exercised broad discretion" in "carry[ing] out instructions from the law firm principals." Napoli, 45 F.3d at 683. Similarly, in Wong, at least two of the lower level employees whose convictions were upheld had significant managerial roles; Joseph Wang "moved up the ladder" and "began planning crimes," Wong, 40 F.3d at 1374, and Alex Wong "helped organize" an effort to locate witnesses who had identified him as a shooter, see id. However, other defendants in Wong appear to have been deemed RICO participants only because they committed crimes in furtherance of the enterprise, albeit under the direction of their supervisors. See id. The affirmance of their convictions is not easily harmonized with the assertion in Viola that "the simple taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." Viola, 35 F.3d at 41.
 
 
 35
 We think the only principle to be drawn from this array of holdings and statements is that the commission of crimes by lower level employees of a RICO enterprise may be found to indicate participation in the operation or management of the enterprise but does not compel such a finding. Napoli and Wong affirmed the factfinding by juries, reached after a full trial. Unless a civil RICO defendant is indisputably directing the affairs of the enterprise, his commission of crimes that advance its objectives must be assessed by a fact-finder to determine whether or not his criminal activity, assessed in the context of all the relevant circumstances, constitutes participation in the operation or management of the enterprise's affairs.
 
 
 36
 The record here contains some circumstantial evidence that all the Appellants' acts of bribery were coordinated through the PSIA and the CIE. On the other hand, the Appellants are entitled to argue to a jury that they independently recognized the possibility of bribing scalehouse employees.[4] A reasonable fact-finder could find that payment of the bribes either did or did not render the defendants liable under section 1962(c).
 
 
 37
 Nor can the Government obtain summary judgment against the Allen Defendants on its theory that, as outsiders, they "operated" the Carting Industry Enterprise by bribing it. Though an enterprise can be " 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery," Reves, 507 U.S. at 184, 113 S.Ct. 1163, the Allen Defendants contend that their payments to the scalehouse employees were bribes to them individually, not to the enterprise collectively. By John Allen's account, he dealt only with certain scalehouse workers--Vittorio, Jerome Kowalski, and Peter Stramiello--not with the other corrupt carters. And the Allen Defendants can point out that they neither sought nor obtained any benefits from the enterprise. Whether their bribes demonstrated operation or management of the enterprise remains a matter for fact-finding.
 
 
 38
 Summary judgment was not warranted on the issue of the Appellants' RICO liability.
 
 
 39
 B. The Allen Defendants' Coercion/Extortion Defenses
 
 
 40
 The Allen Defendants also contend that they adduced facts sufficient to support valid defenses of coercion and extortion to the bribery offenses that served as their RICO predicate acts. They point to the statements in John Allen's affidavit (i) that he observed that all the other carters dumping in the Oyster Bay dump were allowed to "slip" (or, as he terms it, "tip") the scale, (ii) that "we were the only carter dumping at the Oyster Bay dump who was actually paying the amount required," and (iii) that "[i]n order to survive, we had to pay off the scalehouse employees to allow us to pay lower prices."
 
 
 41
 The Allen Defendants rely on several New York statutes to establish the legal basis for their defense to the alleged acts of bribery. Under New York law, in a bribery prosecution,
 
 
 42
 it is a defense that the defendant conferred or agreed to confer the benefit involved upon the public servant involved as a result of conduct of the latter constituting larceny committed by means of extortion, or an attempt to commit the same, or coercion, or an attempt to commit coercion.
 
 
 43
 N.Y. Penal L. § 200.05. "Larceny by extortion," in turn is defined, in relevant part, as follows:
 
 
 44
 A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor will:
 
 
 45
 ...
 
 
 46
 (viii) Use or abuse his position as a public servant by performing some act within or related to his official duties, or by failing or refusing to perform an official duty, in such manner as to affect some person adversely.
 
 
 47
 Id. § 155.05(2)(e). And second-degree coercion is similarly defined as follows:
 
 
 48
 A person is guilty of coercion in the second degree when he compels or induces a person to engage in conduct which the latter has a legal right to abstain from engaging in, or to abstain from engaging in conduct in which he has a legal right to engage, by means of instilling in him a fear that, if the demand is not complied with, the actor or another will:...
 
 
 49
 8. Use or abuse his position as a public servant by performing some act within or related to his official duties, or by failing or refusing to perform an official duty, in such a manner as to affect some person adversely.
 
 
 50
 Id. § 135.60.
 
 
 51
 These statutes do not support the alleged defenses. The statutes require that the government official actually "compel" or "induce" the citizen's conduct through "instilling in him a fear" of certain consequences. All those verbs require some active demand or threat on the part of the government official. However, in this case, John Allen claims to have discovered the corrupt scheme by observing it in action, and then demanding that he be allowed to participate. The scalehouse workers' compliance with this demand is not the sort of active, overbearing conduct that would allow the Allen Defendants to claim that they were either extorted or coerced.
 
 
 52
 Nor can the Allen Defendants enlist the statutes by relying on the provision that covers "refusing to perform an official duty," Id. §§ 155.05(2)(e), 135.60. What the scalehouse employees refused to do without a payment was falsely report the cargo weight of a truck, a task that is obviously not "an official duty."
 
 
 53
 Summary judgment rejecting the coercion and extortion defenses was properly granted.
 
 Conclusion
 
 54
 We vacate the Orders of the District Court, vacate the granting of summary judgment on the issue of RICO liability, affirm the rejection of the coercion and extortion defenses, and remand for further proceedings.
 
 
 
 *
 The Honorable Leonard D. Wexler of the United States District Court for the Eastern District of New York, sitting by designation
 
 
 [1]
 The Ace Defendants apparently believed that the Government continued to pursue the conspiracy count against them, and included this count in their unsuccessful motion for summary judgment. The District Court, apparently deflected by this pleading from its previous action dismissing the conspiracy count, purported to grant summary judgment for the Government on both counts (as to the Ace Defendants). See United States v. PSIA, No. 89-CV-1848, 1997 WL 724609 (E.D.N.Y. Sept.30, 1997). The Government now informs us that it "is not seeking liability against defendants based on RICO conspiracy charges." Brief for Government in No. 97-6274, at 37. Since nothing in the District Court's remedial order turns on the existence of a conspiracy count, we will confine our consideration to the substantive count
 
 
 [2]
 The Court explicitly noted Congress's use of the word "conduct" as both a verb and a noun in the same sentence. Indeed, the Court based its interpretation of the statutory language in part on this dual use of the word. See Reves, 507 U.S. at 178, 113 S.Ct. 1163
 
 
 [3]
 The dissent in Reves argued that " 'conduct' should not be limited to the sense of 'directing' and pointed out that while the leader of an orchestra can be said to 'conduct' an orchestra all of those who participate in an investigation can be said to 'conduct' the investigation". Reves, 507 U.S. at 187-88, 113 S.Ct. 1163 (Souter, J., with whom White, J., joins, dissenting)
 
 
 [4]
 The Government cites a statement in Vittorio's affidavit that he understood his co-worker, Chin Lee, to inform him about "an agreement that the carters would make regular payments of money to the scalehouse employees in return for allowing them to slip the scale." Joint Appendix in No. 97-6274, at 927. However, this statement is insufficient to entitle the Government to summary judgment. Even if Lee, though not a defendant, is shown to be a co-conspirator, his statement is ambiguous: it might be understood to advert to an agreement between the carters as a unit, on the one hand, and the scalehouse employees, on the other, or it might be construed to mean that individual carters had agreements with the scalehouse employees. Indeed, the widely divergent sums allegedly paid by the defendants would see Joint Appendix in No. 97-6274, at 930-40 (Vittorio's affidavit), would support the inference that the individual carters negotiated separate bribery agreements. In reviewing the District Court's grant of summary judgment, the Appellants, as non-movants, are entitled to the benefit of all permissible inferences. See, e.g., Roditis v. United States, 122 F.3d 108, 110 (2d Cir.1997)