12-41-cv
Noel v. New York City Taxi & Limousine Comm'n

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued: April 19, 2012        Decided: June 28, 2012)

Docket No. 12-41-cv

- - - - - - - - - - - - - - - - - - - - - - -x

**CHRISTOPHER NOEL; SIMI LINTON; UNITED SPINAL, a nonprofit organization; TAXIS FOR ALL CAMPAIGN, a nonprofit organization; 504 DEMOCRATIC CLUB, a nonprofit organization; DISABLED IN ACTION, a nonprofit organization,**

**PLAINTIFFS-APPELLEES,**

**-v.-**

**NEW YORK CITY TAXI AND LIMOUSINE COMMISSION, a charter mandated agency; DAVID YASSKY, in his official capacity, as Commissioner of the New York City Taxi and Limousine Commission,**

**DEFENDANTS-APPELLANTS.**

- - - - - - - - - - - - - - - - - - - - - - -x

Before:        JACOBS, Chief Judge, KEARSE and HALL, Circuit Judges.

Appeal from a temporary injunction entered in the United States District Court for the Southern District of New York (Daniels, J.) requiring all new taxi medallions and street-hail livery licenses issued in the City of New York be limited to vehicles that are wheelchair accessible.  We conclude that defendants are not in violation of Title II, Part A, of the Americans with Disabilities Act and that the district court therefore erred in granting partial summary judgment for plaintiffs and entering the temporary injunction.

Vacated and remanded for entry of partial summary judgment for defendants and further proceedings consistent with this opinion.

Michael A. Cardozo, Corporation Counsel of the City of New York (Leonard Koerner, Robin Binder, Michelle Goldberg-Cahn, Ronald E. Sternberg, on the brief), for Defendants-Appellants.

Sid Wolinsky (Julia Pinover, Mary-Lee Smith, Kara J. Janssen, on the brief), Disability Rights Advocates (Allegra L. Fishel, Outten and Golden, LLP, on the brief), for Plaintiffs-Appellees.

Richard D. Emery (Emery Celli Brinckerhoff & Abady LLP), for Taxicab, Limousine & Paratransit Association as amicus curiae in support of Defendants-Appellants.

DENNIS JACOBS, Chief Judge:

Two people who use wheelchairs and the organizations that represent persons with disabilities bring this class action against the New York City Taxi and Limousine Commission ("TLC") and the TLC Commissioner David Yassky for violation of Parts A and B of Title II of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973, and the New York City Human Rights Law. The United States District Court for the Southern District of New York (Daniels, J.) granted plaintiffs partial summary judgment as to liability on the claim that defendants are violating Part A of Title II of the ADA ("Title II(A)") by failing to provide meaningful access to taxi services for persons with disabilities. The district court also entered a temporary injunction that requires that all new taxi medallions and street-hail livery licenses be limited to vehicles that are wheelchair accessible ("accessible taxis"), until the TLC proposes and the district court approves a comprehensive plan to provide meaningful access to taxi service for wheelchair-bound passengers.

Defendants appeal the injunction and the grant of partial summary judgment upon which the injunction is premised. Appellate jurisdiction exists to review the injunction and the underlying merits that relate to it. We

3

conclude that, though the TLC exercises pervasive control over the taxi industry in New York City, defendants were not required by Title II(A) to deploy their licensing and regulatory authority to mandate that persons who need wheelchairs be afforded meaningful access to taxis. The district court therefore erred in entering the temporary injunction.

Accordingly, we vacate the temporary injunction and remand for the district court to enter summary judgment for defendants on the Title II(A) claim and for further proceedings consistent with this opinion.[1]

## BACKGROUND

The facts are not in dispute. Plaintiffs are [1] persons with disabilities who seek fuller access to New York City taxis and [2] organizations who represent them. They contend that the taxi services in New York City fail to give meaningful access to persons with disabilities and that the TLC thus discriminates in violation of the ADA, the Rehabilitation Act, and the New York City Human Rights Law.

---

[1] Because we vacate the temporary injunction as improvidently granted, we need not address defendants' secondary argument that the district court erred by entering an injunction that, as defendants contend, exceeded the scope of the litigation and the request of plaintiffs.

There are two types of licensed taxis in New York City: the traditional yellow cabs and the livery cabs. The yellow cabs are "medallion taxis" because the license is accompanied by a metal "medallion" that is affixed to the outside of the taxi. N.Y.C. Admin. Code § 19-502(h). A yellow taxi is a 5-passenger vehicle for hire licensed "to accept hails from passengers in the street." Id. § 19-502(l). A livery cab is a 5-passenger vehicle for hire that is dispatched from a livery base station on a pre-arranged basis. See 35 N.Y.C. Rules & Regs. §§ 59A-03(j), (k); see generally N.Y.C. Admin. Code § 19-502(g) (defining "for-hire vehicle"). Livery cabs have not been authorized to accept street hails.[2]

---

[2] New York adopted legislation in December 2011 (amended in February) (1) allowing the TLC to sell 2,000 additional yellow taxi medallions, all of which must be for accessible taxis, and (2) establishing the Hail Accessible Inter-Borough License ("HAIL") program, which permits livery vehicles to respond to street hails in northern Manhattan and the other boroughs. See 2012 NY ALS 9 (amending 2011 NY ALS 602). The TLC will be authorized to issue 18,000 HAIL licenses over a three-year period: 6,000 in the first year, 6,000 in the second year, and 6,000 in the third year. Twenty percent of the HAIL licenses are for accessible vehicles. Id. at § 5(b).

The licenses and medallions are expected to yield over a billion dollars in revenue for the City. Significantly, the TLC cannot sell any of its new accessible medallions until the HAIL license program commences. Id. at § 8.

Under the City Charter, all taxis are licensed and regulated by the TLC, an administrative agency of the City of New York under the Deputy Mayor for Operations. See 65 N.Y.C. Charter § 2300. As a condition of licensure, taxi owners and drivers must comply with the TLC's applicable laws and regulations. Id. §§ 2300, 2303; N.Y.C. Admin. Code § 19-504. Under the City Charter, the TLC "adopt[s] and establish[es] an overall public transportation policy governing taxi, coach, limousine, wheelchair accessible van services and commuter van services as it relates to the overall public transportation network of the city." N.Y.C. Charter § 2300. This includes "set[ting] standards and criteria for the licensing of vehicles, drivers and chauffeurs"; establishing "standards of service, . . . insurance and minimum coverage, . . . driver safety, . . . equipment safety and design, . . . noise and air pollution control"; and adjudicating "charges of violations of the provisions of the administrative code and rules promulgated thereunder." Id. §§ 2300, 2303.

The number of medallions is limited by law to 13,237. At least 231 are designated for wheelchair-accessible vehicles, though any medallion owner may operate such a taxi

6

regardless of whether the medallion has that designation. Currently, 233 taxis are so accessible; 98.2% of medallion taxis are therefore inaccessible to persons in wheelchairs.[3] Not surprisingly, the wait time for accessible taxis is prolonged. The record shows that the chances of hailing any taxi in Manhattan within ten minutes is 87.33%, whereas the chances of hailing an accessible taxi within ten minutes is 3.31%.

*  *  *

After some discovery, plaintiffs moved for partial summary judgment only on the ADA claims and only as to liability. Defendants cross-moved on all claims. Each side's motion for summary judgment was granted in part and in part denied.

As to Part B of Title II of the ADA ("Title II(B)"), which governs public transportation, the district court granted summary judgment in favor of defendants. The district court reasoned that although the TLC has "extensive regulatory powers," the agency itself has "no authority to

_____

[3] The complaint alleges that 60,000 people in New York City are wheelchair users. The City's population exceeds eight million. See 2010 Census Bureau, available at http://www.nyc.gov/html/dcp/html/census/popcur.shtml (last visited June 20, 2012). Accordingly, people in wheelchairs make up approximately 0.73% of New York City's population.

provide [public transportation] services, and does not function as a transportation services provider, to the public." Noel v. New York City Taxi & Limousine Comm'n, -- F. Supp. 2d --, No. 11 Civ. 237 (GBD), 2011 WL 6747466, *5 (S.D.N.Y. Dec. 23, 2011). Because the TLC does not "operate" a public transportation service, the district court held that the TLC is not obligated under Title II(B) to ensure meaningful access to taxis for persons with disabilities. Id. at *6.

However, as to Title II(A), which governs public services generally, the district court granted summary judgment in favor of plaintiffs. The district court reasoned that the TLC "is a public entity carrying out a public regulatory function that affects and confers a benefit on New York City taxicab riders," and therefore may not discriminate in any of its functions--including its regulatory activities--and must ensure persons with disabilities have meaningful access to taxis in New York City. Id. at *8. The district court determined that plaintiffs enjoyed no meaningful access to taxis, id., and were therefore entitled to summary judgment, id. at *8-9.

8

The district court then entered a temporary injunction that had immediate impact in view of recent changes in New York State law, which had authorized the issuance of additional medallions and authorized, for the first time, livery cabs to pick up street hails in under-served areas of the City. See supra note 1. The injunction is as follows:

> [t]he TLC must propose a comprehensive plan to provide meaningful access to taxicab service for disabled wheelchair bound passengers. Such a plan must include targeted goals and standards, as well as anticipated measurable results. Until such a plan is proposed and approved by th[e District] Court, all new taxi medallions sold or new street-hail livery licenses or permits issued by the TLC must be for wheelchair accessible vehicles.

Id. at *9.

On appeal, defendants challenge the temporary injunction and the grant of summary judgment, to the extent it bears on the injunction. While the appeal was pending, we granted defendants' motion to stay enforcement of the injunction. We now consider the merits of defendants' appeal and vacate the temporary injunction.[4]

---

[4] Because this appeal comes to us on review of the district court's temporary injunction and because plaintiffs have not cross-appealed, the issue of whether the district court correctly granted summary judgment for defendants on the Title II(B) claim is not before us. In addition, because the district court did not rule on plaintiffs' Rehabilitation Act and state law claims, those claims are also not before us.

**JURISDICTION**

We have jurisdiction over this interlocutory appeal because the district court entered an order "granting" an "injunction[]." See 28 U.S.C. § 1292(a)(1). By the same token, we have jurisdiction to "consider the underlying merits of the case, to the extent they relate to the propriety of granting injunctive relief." United States v. Allen, 155 F.3d 35, 39 (2d Cir. 1998) (alterations and internal quotation marks omitted) (holding that this Court had jurisdiction to consider not only the injunction but also the merits of the district court's determination that the appellee was entitled to summary judgment). Accordingly, we review the entry of the temporary injunction as well as the grant of partial summary judgment on which it is based.

**DISCUSSION**

We review a district court's grant of injunctive relief for abuse of discretion. Kapps v. Wing, 404 F.3d 105, 112 (2d Cir. 2005). "A district court abuses its discretion when it rests its decision on an error of law or clearly erroneous finding of fact." Abrahams v. MTA Long Island Bus, 644 F.3d 110, 115 (2d Cir. 2011).

10

We review the grant of summary judgment, which was the basis for the temporary injunction, de novo. Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003).

I

One goal of the ADA is to "'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" Henrietta D. v. Bloomberg, 331 F.3d 261, 273 (2d Cir. 2003) (quoting 42 U.S.C. § 12101(b)(1)). To do so, the ADA's "first three titles proscribe discrimination against individuals with disabilities in employment and hiring (Title I), access to public services (Title II), and public accommodations (Title III)." Id. Title II is, in turn, "divided into Parts A and B": "Part A governs public services generally," and Part B "governs the provision of public transportation services." Abrahams, 644 F.3d at 115. This appeal involves only Title II(A).

Title II(A) provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from

11

participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132. To prevail under Title II(A), "plaintiffs must demonstrate that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities."  Henrietta D., 331 F.3d at 272.  Defendants do not dispute that plaintiffs are qualified individuals or that the TLC is a public entity that is generally subject to Title II(A).  The only question on appeal then is whether the TLC denied plaintiffs an opportunity to participate in its services, programs, or activities, or otherwise discriminated against them on account of a disability.

**II**

"As a remedial statute, the ADA must be broadly construed to effectuate its purpose" of providing "a clear and comprehensive national mandate for the elimination of

12

discrimination against individuals with disabilities."
Innovative Health Sys., Inc. v. City of White Plains, 931 F. Supp. 222, 232 (S.D.N.Y. 1996) (internal quotation marks omitted), aff'd in part, 117 F.3d 37 (2d Cir. 1997), recognized as superseded on other grounds, Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 171 n.7 (2d Cir. 2001). Accordingly, the phrase "services, programs, or activities" has been interpreted to be "a catch-all phrase that prohibits all discrimination by a public entity." Innovative Health Sys., 117 F.3d at 45.

Although the ADA is to be interpreted broadly, "the scope of Title II is not limitless." See Reeves v. Queen City Transp., Inc., 10 F. Supp. 2d 1181, 1185 (D. Col. 1998). In enacting Title II, Congress directed the Attorney General to promulgate regulations to implement Title II(A), see 42 U.S.C. § 12134(a), and the Attorney General's regulations add scope and shape to the general prohibitions in the ADA, which are not self-reading. As the House Judiciary Committee Report conceded, it is "the purpose of this section . . . to direct the Attorney General to issue regulations setting forth the forms of discrimination prohibited." H.R. Rep. 101-485(III) at 52, reprinted in 1990 U.S.C.C.A.N. 445, 475.

13

The most relevant regulation here is 28 C.F.R. § 35.130(b)(6), which governs the conduct of a public entity administering a licensing program. The TLC, of course, administers a licensing program: the licensing of taxis. Section 35.130(b)(6) prohibits a "public entity" from "administer[ing] a license or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability" or "establish[ing] requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability."

Notwithstanding the broad construction of the ADA, Section 35.130(b)(6) does not support plaintiffs' claim against the TLC. Section 35.130(b)(6) prohibits the TLC from refusing to grant licenses to persons with disabilities who are otherwise qualified to own or operate a taxi (i.e., qualified medallion purchasers and drivers); it does not assist persons who are consumers of the licensees' product. This reading of Section 35.130(b)(6) is consistent with the Technical Assistance Manual of the Department of Justice ("TAM"), which is persuasive authority as to the ADA's meaning, unless it is plainly erroneous or inconsistent with

14

the ADA's regulations.  See Innovative Health Sys., 117 F.3d at 45 n.8.  The section involving licensing makes clear that the persons who are protected are those who are seeking licenses:

> A public entity may not discriminate on the basis of disability in its licensing, certification, and regulatory activities.  A person is a "qualified individual with a disability" with respect to licensing or certification, if he or she can meet the essential eligibility requirements for receiving the license or certification. . . . Public entities may not discriminate against qualified individuals with disabilities who apply for licenses, but may consider factors related to the disability in determining whether the individual is "qualified."

ADA TAM II-3.7200, available at http://www.ada.gov/taman2.html#II-3.7200 (last visited June 20, 2012).  The example given in the TAM reinforces that limitation:

> ILLUSTRATION: A State prohibits the licensing of transportation companies that employ individuals with missing limbs as drivers.  XYZ company refuses to hire an individual with a missing limb who is 'qualified' to perform the essential functions of the job, because he is able to drive safely with hand controls.

Id.  The TAM concludes that such a licensing requirement would violate Title II(A), id., but--critically--that "[t]he State is not accountable for discrimination in the employment or other practices of XYZ company, if those

15

practices are not the result of requirements or policies established by the State." Id.

That guidance goes far to deciding this appeal. The gravamen of plaintiffs' claim is that there are too few accessible taxis in New York City and that the TLC should use its regulatory authority to require that more taxis be accessible. But no such claim is cognizable under Title II(A) against the TLC because nothing in the TLC's administration of the licensing program discriminates against persons with disabilities. Although only 231 medallions are conditioned on wheelchair accessibility, none of the medallions issued by the TLC prohibits any medallion owner from operating an accessible taxi.

## III

Plaintiffs contend that the TLC violates Title II(A) because the industry it licenses fails to provide meaningful access to taxis for persons with disabilities.

As an initial matter, Title II(A) makes clear that "[t]he programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered

16

by [Title II(A)]."  28 C.F.R. § 35.130(b)(6).[5]  As the TAM advises: "[a]lthough licensing *standards* are covered by title II, the *licensee's activities themselves* are not covered.  An activity does not become a 'program or activity' of a public entity merely because it is licensed by the public entity."  ADA TAM II-3.7200 (emphasis added). At the risk of being obvious, "[t]he New York City taxicab industry is a private industry."  Freidman v. Gen. Motors Corp., 721 F. Supp. 2d 218, 220 (S.D.N.Y. 2010). Accordingly, even if private industry (such as the New York City taxi industry) fails to provide meaningful access for persons with disabilities, a licensing entity (such as the TLC) is not therefore in violation of Title II(A), unless the private industry practice results from the licensing requirements.  See ADA TAM II-3.7200.

This conclusion was adopted by the two district courts that have considered the issue.  It was claimed in Tyler v. City of Manhattan, 849 F. Supp. 1429, 1441-42 (D. Kan. 1994), that Manhattan (Kansas) violated Title II(A) by granting liquor licenses to businesses that were

_____

[5] Cf. 49 C.F.R. § 37.37(a) (Title III) (Department of Transportation regulation providing that "[a] private entity does not become subject to the requirements of this part for public entities[] because it . . . is regulated by, or is granted a . . . permit to operate by a public entity.").

17

inaccessible to persons with disabilities.  The district court concluded "that the regulations implementing Title II of the ADA do not cover the programs and activities of [private] entities that are licensed or certified by a public entity."  Id. at 1441 (citing 28 C.F.R. § 35.130(b)(6)); accord id. (explaining that "[a]lthough *City programs* operated under contractual or licensing arrangements may not discriminate against qualified individuals with disabilities, the programs or activities of licensees or certified entities are not themselves programs or activities of the public entity merely by virtue of the license or certificate."  (internal citation, quotation marks, and alteration omitted)).  Tyler ruled that the licensing of non-accessible private establishments did not deny "access to services, aids, and programs *provided by the City* under licensing or contractual arrangements."  Id. at 1442.

The plaintiff in Tyler also argued that the city's physical inspection of licensed facilities provided a benefit to non-disabled people only, because only non-disabled people could enter those establishments.  Id.  The district court explained that it was not the government inspections that denied access to the facilities or the

benefits of being there; it was the facilities themselves, which were operated privately. Id. Such a claim is not actionable under Title II(A), Tyler reasoned, because "Title II . . . and its implementing regulations prohibit discrimination against qualified individuals only *by public entities*" and do "not go so far as to require public entities to impose on private establishments, as a condition of licensure, a requirement that they make their facilities physically accessible to persons with disabilities." Id. Because private establishments are not services, programs or activities of a public entity, Tyler held that they are not governed by Title II(A) or its implementing regulations. Id.

In Reeves v. Queen City Transportation, Inc., 10 F. Supp. 2d 1181 (D. Colo. 1998), a private company transported guests to resorts in vehicles that were not wheelchair accessible. The plaintiffs sued the public utility commission that had issued the company a certificate to operate, alleging a violation of Title II(A). Id. at 1182-83.

In rejecting the Title II(A) challenge, the District of Colorado concluded that the utility commission "operates a certification program, not a transportation program," and

19

that "issuance of a certificate of" operation to a private transportation company "does not constitute a violation of Title II even if [that company] subsequently engage[s] in unlawful discrimination." Id. at 1186 (internal quotation marks omitted).

Plaintiffs undertake to distinguish these cases on the ground that this Circuit interprets the ADA more broadly. To be sure, this Circuit broadly interprets the ADA, see Innovative Health Sys., 117 F.3d at 45--and the district court here relied on that broad construction, see Noel, 2011 WL 6747466, at *7-8. However, the ADA is not without limits, and limits are found in the Attorney General's regulations, which (as relevant here) emphasize that Title II(A)'s prohibition on discrimination by public entities does not compel public entities to police compliance by the private entities they license. E.g., 28 C.F.R. § 35.130(b)(6); see also ADA TAM II-3.7200. Moreover, Reeves can hardly be distinguished on the ground that it is incompatible with the Second Circuit's broad reading of the ADA; Reeves properly cites our decision in Innovative Health Systems for that proposition. Reeves, 10 F. Supp. 2d at 1183.

Plaintiffs also contend that this case is different because the TLC's control of the taxi industry is pervasive. See N.Y.C. Charter § 2303(b); Statharos v. N.Y. City Taxi & Limousine Comm'n, 198 F.3d 317, 321, 324 (2d Cir. 1999). Pervasive control is significant, plaintiffs argue, because it was the dispositive factor in Paxton v. State of West Virginia Department of Tax & Revenue, 451 S.E. 2d 779 (W. Va. 1994).

In Paxton, the West Virginia Supreme Court affirmed a writ of mandamus compelling a lottery commission--a public entity--to require all places that sell lottery tickets to be accessible to persons with disabilities. Id. at 781, 786. The court noted that the lottery commission has substantial control and regulatory authority over the lottery, id. at 783-84, but that was not essential to the decision. The crucial fact--which was held to distinguish the lottery franchises from the liquor licenses in Tyler-- was that, "through its contract vendors the Lottery Commission furnishes the lottery devices and services that allow the licensee to conduct lottery sales." Id. at 785. Thus the lottery commission was not "only engaged in a licensing arrangement," but "provide[d] an aid, benefit or service on a continuing basis to its licensee"; and that is

21

the reason that the West Virginia Supreme Court held that the commission was covered by Title II(A).  Id. ("[T]he lottery is the service provided by the Lottery Commission, and it is this service that makes the Lottery Commission subject to the ADA under 28 C.F.R. § 35.130(b)(1).").[6]

We neither endorse nor challenge the reasoning of Paxton.  In any event, our case is a closer analog to Reeves and Taylor, in which the public entity is merely the entity charged with regulating and licensing private industry.  The TLC's control over the taxi industry, however pervasive it is at this time, does not make the private taxi industry "a 'program or activity' of a public entity."  See ADA TAM II-3.7200; accord 28 C.F.R. § 35.130(b)(6).[7]  Accordingly, the

---

[6] Reeves distinguished Paxton on this same basis: that Paxton "relied heavily on" the fact "that state statutes charged the Lottery Commission with operation of the state lottery on a continuous basis," such that "the lottery is the service provided by the Lottery Commission."  Reeves, 10 F. Supp. 2d at 1187 (internal quotation marks omitted).

[7] Plaintiffs' "pervasive control" argument might have more force if the TLC failed to include accessible models on its list of vehicles that medallion holders can use as taxis.  There is no showing, however, that the TLC inhibits the purchase of accessible medallions or vehicles that can be adapted for wheelchair access.  In short, the ADA does not require a licensing entity to use its regulatory power to coerce compliance by a private industry.
Plaintiffs suggest that the Taxi-for-Tomorrow Initiative violates Title II(A) by effectively preventing medallion owners from using an accessible vehicle.  Taxi-for-Tomorrow, which is non-binding, "seeks to select the

22

TLC does not violate the ADA by licensing and regulating a private taxi industry that fails to afford meaningful access to passengers with disabilities.

**IV**

None of the regulations cited by plaintiffs require a different result.

Section 35.130(b)(1)(i) provides that "[a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service" "on the basis of [that individual's] disability."  28 C.F.R. § 35.130(b)(1)(i). This provision bars a public entity from discriminating by refusing to issue a license to a person who has a disability because of the disability; but the TLC denies that it engages in any such discrimination, and Plaintiffs do not

_____

next vehicle that will be used as the standard taxicab of New York."  Joint App'x 33.  According to the record, a committee tentatively accepted the Nissan NV200.  The current model of the NV200 is not accessible, but the model that would serve as the standard taxi is still being developed.  Joint App'x 142.  We decline to decide now issues that might arise in the future as the project goes forward.

23

dispute the point. Moreover, to the extent that plaintiffs argue that the "service" the TLC provides is the regulation of the taxi industry, plaintiffs' argument is the same argument that was rejected in Tyler, where the plaintiff pleaded inability to avail himself of the benefits of the municipality's physical inspections of non-accessible facilities.

Plaintiffs also rely on 28 C.F.R. § 35.130(b)(3)(i), which prohibits a "public entity . . . , directly or through contractual or other arrangements," from "utiliz[ing] criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." This is aimed at requirements that discriminate against people with disabilities, such as when a public entity refuses to do business with a person who has a disability. See, e.g., ADA TAM II-3.7100, available at http://www.ada.gov/taman2.html#II-3.7100 (last accessed June 20, 2012). Plaintiffs raise no such claim against the TLC.

Finally, plaintiffs argue that Section 35.130(b)(6) (discussed at length above) governs their claim because it (in part) prohibits "a public entity [from] establish[ing] requirements for the programs or activities of licensees or

24

certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability." An example of such discrimination would be denying licenses to transportation companies that employ individuals with disabilities, which causes discrimination against prospective employees who are otherwise qualified.  ADA TAM II-3.7200.  The TLC licensing scheme is distinguishable on the elementary ground that it does *not* cause discrimination.

Instead, plaintiffs contend that the TLC violates the ADA because it *could* require more taxis to be accessible, but does not.  The TLC's licensing requirements do not discriminate and do not cause anyone else to discriminate, by licensing or otherwise.  The TLC's licenses do not bar taxi owners from operating accessible vehicles.  The only medallions that specify whether the taxi must be accessible specify that the taxi operated pursuant to that license be *accessible*.  No doubt, more such taxis would be on the streets if the TLC required more of them to be accessible. But the TLC's failure to use its regulatory authority does not amount to discrimination within the meaning of the ADA or its regulations.

25

**V**

It may be that there is a failure to provide meaningful access to taxis for persons with disabilities. But if so, it is a failure of the taxi industry in New York City. Plaintiffs do not--and cannot--bring such a claim against the taxi industry directly under Title III of the ADA (which governs private entities), because Title III expressly exempts taxi providers from purchasing or leasing "accessible automobiles." 49 C.F.R. § 37.29(b).[8]

Plaintiffs assert their claim under Title II(A), but Title III is instructive nevertheless. Plaintiffs contend that the TLC violates the ADA because the industry it pervasively regulates fails to afford meaningful access to persons with disabilities. But since the taxi industry itself is exempt, there is no underlying violation of the ADA for the TLC to redress by regulation. The district court, which has held that the TLC must increase the number of handicap-accessible taxis, has thus run counter to the

---

[8] If, however, "a provider of taxi service purchases or leases a vehicle other than an automobile, the vehicle is required to be accessible . . . ." 49 C.F.R. § 37.29(b). Nevertheless, because "[a] provider of taxi service is not required to purchase vehicles other than automobiles in order to have a number of accessible vehicles in its fleet," a taxi provider is not obligated to purchase or lease vehicles accessible to persons with disabilities. Id.

policy choice of the political branches, which exempted the taxi industry from the ADA.

This was a problem of which the district court was all too aware.  Discussing plaintiffs' Title II(B) claim, the district court observed:

> Title III cannot be read as exempting taxicab owners from any requirement that they purchase wheelchair accessible automobiles, but at the same time have intended that subtitle B of Title II impose such a personal obligation based solely on the extent of the control of the public regulatory agency.  The effect would be to impose an obligation on those private owners under subtitle B of Title II that Congress explicitly intended to exempt under Title III.  Congress had the same power to require regulated private owners providing taxi service to purchase wheelchair accessible automobiles under Title III, and chose not to do so.

Noel, 2011 WL 6747466, at *6.

That sound reasoning applies with equal force to plaintiffs' Title II(A) claim.  If the TLC is required under Title II(A) to ensure that the taxi industry provides a sufficient number of accessible taxis, then private taxi owners would be required to purchase or lease accessible taxis even though the ADA explicitly exempts them from such requirements.  49 C.F.R. § 37.29(b).  The exemption compels the conclusion that the ADA, as a whole, does not require

27

the New York City taxi industry to provide accessible taxis.[9]

* * *

In sum, Title II(A) does not obligate the TLC to use its licensing and regulatory authority over the New York City taxi industry to require that taxi owners provide meaningful access to taxis for persons with disabilities. The district court therefore erred in granting summary judgment for plaintiffs on their Title II(A) claim and in entering a temporary injunction premised on that grant of summary judgment.  See Abrahams, 644 F.3d at 115 (holding that "[a] district court abuses its discretion when it[, inter alia,] rests its decision on an error of law").

---

[9] We reject plaintiffs' argument that, in this case, Title II and Title III merely provide differing standards of obligations under the ADA and that, where standards differ, the standard providing the highest degree of access must be met.  See ADA TAM II-1.3000, Illustration 3, available at http://www.ada.gov/taman2.html#II-1.3000 (last accessed June 20, 2012).  It may be true, as the TAM example demonstrates, that when public and private entities form a joint venture to build a stadium, the stadium must comply with both Title II and Title III and, where the standards differ, the stadium must comply with the higher standard.  But here, there is no joint venture.  Nor do standards differ: the taxi industry is exempt from the ADA.  If Title II(A) were construed to require indirectly that the taxi industry provide accessible vehicles, Title III's exemption would be undone altogether.

**CONCLUSION**

Accordingly, the district court's temporary injunction is vacated. The case is remanded with instructions for the district court to grant summary judgment to defendants on the Title II(A) claim and for further proceedings consistent with this opinion.